499 So.2d 114 (1986)
Joan Provost SEALS, Wife of/and Leo SEALS
v.
M.L. PITTMAN, Jr., M.D., et al.
No. CA 85 0992.
Court of Appeal of Louisiana, First Circuit.
October 15, 1986.
Rehearing Denied January 12, 1987.
Writ Denied March 13, 1987.
*116 Carl J. Schumacher, Jr., David Schumacher, New Orleans, Edward Shamis, Jr., Slidell, for plaintiffs/appellants.
Lloyd W. Hayes, New Orleans, for M.J. Duplantis and Hartford Fire Ins. Co. defendants herein.
William Penick, New Orleans, for M.L. Pittman, & St. Paul Fire & Marine Co., defendants.
Peter T. Dazzio, Baton Rouge, for St. Tammany Parish.
Before GROVER L. COVINGTON, C.J., and WATKINS and JOHN S. COVINGTON, JJ.
GROVER L. COVINGTON, Chief Judge.
This appeal arises from a nine to three verdict in favor of the defendants, denying plaintiffs' claim for damages sustained as a result of alleged medical malpractice.
The trial court rendered judgment on the jury verdict. Thereafter, plaintiffs moved for a judgment notwithstanding the verdict, for a new trial and to enforce a compromise agreement, which motions were denied. The plaintiffs have appealed. We affirm.
The relevant facts of this case are as follows.
Dr. M.L. Pittman, Jr., a practicing surgeon in the Covington area, saw Joan Provost Seals in his office on December 17, 1979. She gave the doctor a history of right upper quadrant abdominal pain with distension. According to the information provided Dr. Pittman, she had been seen at the Highland Park Hospital Emergency Room by Dr. Montalbano in January, 1979, and treated for a gallbladder condition. One week prior to the office visit she had been seen in a hospital emergency room with complaints of abdominal pain. According to the testimony presented at trial, the pain she was having in December, 1979, was severe and constant. Following physical examination, a diagnosis of cholelithiasis was made and symptomatic treatment begun. Surgical treatment was recommended, but delayed at plaintiff's request.
The patient was admitted to St. Tammany Parish Hospital on December 27, 1979. History was of recurrent severe attacks of right upper quadrant abdominal pain and abdominal distension with intolerance of fried or greasy foods. Preoperative testing was performed including a cholecystogram and gallbladder echogram. The echogram was interpreted as suggestive of chronic cholecystitis. Surgery, consisting of an exploratory laparotomy and cholecystectomy, was performed on January 4, 1980 by Dr. Pittman, with Dr. M.J. Duplantis assisting.
The standard right mid-rectus abdominal incision was used. The gallbladder was identified. Marked inflammatory changes were noted and extensive adhesions and scar tissue were encountered. The gallbladder was noted to be flattened and constricted. Dr. Pittman noted it to be filled with stones. The top surface of the gallbladder was visible. The adhesions were dissected away from the upper surface of the gallbladder which was then outlined by *117 following the outer edges of the gallbladder. A minimum amount of bile was present. As a result of the dense fibrous and scar tissue, the common bile duct was not identifiable. Because of the added risk of dissecting the ducts in the region, no attempt was made to dissect them. Dr. Pittman identified the junction of the cystic duct and gallbladder without difficulty and performed a high ligation at the gallbladder. The gallbladder was removed by peeling it out from under the liver. No further surgical assistance being needed, Dr. Duplantis left the operating room.
Dr. Pittman performed a postoperative cholecystogram, which is a procedure employed to ensure that no stones remained in the ducts. A catheter tip was placed in the stump of the cystic duct and dye injected. The X-ray showed an absence of the common hepatic duct. The procedure was repeated with the same results. Dr. Meier, the pathologist, was called to the operating room to inspect the gallbladder. After examination of the organ, he could not identify any duct other than the small nub of the cystic duct.
Dr. Pittman continued to explore the abdomen, attempting to locate the common hepatic duct. Additional tissue was submitted to the pathologist but it was not ductal tissue. After further exploration, Dr. Pittman located a small drop of bile which led him to the frayed end of the hepatic duct at the edge of the liver.
Dr. Pittman then called Dr. Patrick Hunter, a local surgeon, who came to the operating room. Dr. Hunter examined and explored the surgical area again, but no ductal material was identified. The gap between the hepatic and common bile ducts created by removal of the gallbladder prevented anastomosis of the ends. Since this was a situation neither surgeon had ever encountered, a phone call was made to Dr. Francis Nance, Professor of Surgery at LSU Medical School. Following the advice of Dr. Nance, a rubber catheter was placed to drain the liver. The patient was then transferred to Dr. Nance at Hotel Dieu Hospital for further surgery and follow-up care.
Suit was filed against Dr. Pittman and his insurer, St. Paul Fire and Marine Insurance Company (St. Paul). Claim for medical panel review was brought against Dr. Duplantis and his insurer, and St. Tammany Parish Hospital. The hospital was not joined in the suit. Dr. Duplantis was voluntarily dismissed at trial.
Prior to trial, certain settlement negotiations were conducted, which included an offer made by defendants by letter of October 25, 1984. This offer was tacitly rejected by plaintiffs. By its terms, the offer expired at 3:00 p.m., October 26. On October 29, trial of this matter commenced before a jury. On Friday, November 2, the parties rested. Over the weekend, oral settlement negotiations were conducted by counsel for plaintiffs and for St. Paul. On November 5, counsel for plaintiffs made a counteroffer to defendants, for settlement of the case based on the terms of the October 25 letter, plus payment of all court costs by appellees. Dr. Pittman objected to any settlement at that point, and negotiations were broken off.
Following closing arguments and jury instructions, and prior to the jury's verdict, plaintiffs were permitted to enter a statement of the settlement discussions in the record.
Subsequently, the jury returned the verdict for the defendants.
On appeal, appellants enumerate four general areas of error in the conduct of the trial, namely:
first, that the jury was improperly selected due to the trial court's failure to excuse certain jurors and potential jurors for cause, and its failure to grant additional peremptory challenges for selection of the jury alternates;
second, that the jury composition accounted for the verdict which determined that Dr. Pittman was free of negligence; third, that the jury erred in concluding there was not a lack of informed consent; and *118 finally, that an enforceable compromise was reached which the trial judge failed to enforce.
No allegations of error are made regarding the instructions of law given the jury by the trial judge, and there is no complaint that the jury verdict is manifestly erroneous. A careful review of the appellants' brief reveals no contention that the jury verdict is unsupported by the evidence.

ISSUE NUMBER ONE: JURY SELECTION
Appellants assert on appeal that errors in the jury selection process flawed the verdict. They object to the failure of the trial judge to grant challenges for cause to several jurors. The record reflects that after voir dire examination of each of the challenged jurors was completed, the trial judge determined that each juror could be fair and impartial. The plaintiffs did not avail themselves of all of their peremptory challenges. They used only five of their six peremptory challenges during the selection of the jury. The parties were granted one additional peremptory challenge for the selection of the alternate juror, which additional challenge was used by the plaintiffs. The record reveals that the plaintiffs used five peremptory challenges to the jury panel and one in the selection of the alternate juror.
Since all of the plaintiffs' peremptory challenges were not exhausted during the impanelling of the jury, appellants cannot complain of the trial judge's failure to excuse a juror for cause. Bernard v. Richoux, 464 So.2d 856 (La.App. 5th Cir. 1985).
It is a well settled principle of law that the trial judge is vested with broad discretion when ruling on challenges for cause. See, Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir.1975), writ denied, 321 So.2d 363 (La.1975). Only when the record demonstrates a clear abuse of discretion should the appellate court intervene. The trial judge is obviously in the best position to assess the juror's demeanor, sincerity, fairness and credibility. Thus, his decision is not subject to disturbance by appellate action without a showing that there was a clear abuse of discretion. Broussard v. Missouri Pacific Railroad Company, 376 So.2d 532 (La.App. 3rd Cir.1979). There is no showing of abuse. Under the circumstances, there is no merit in the appellants' complaint of the jury selection.
Appellants further argue that it was error of the trial judge to refuse to grant challenges for cause to prospective jurors who were themselves or whose close relatives were patients of Dr. Pittman. The same assertion is made for the failure to grant a challenge for cause as to potential jurors who were employees of the hospital where the surgery was performed. No challenge for cause was made at trial to either close relatives of patients of Dr. Pittman or to hospital employees. This issue was not raised at trial and is not preserved for purposes of appellate review. The only challenge for cause made at trial was to patients of defendant.
Juror pool member Stanley Thompson stated not that he was a Pittman patient, but that he had been treated by Dr. Pittman some ten years prior to trial. This is not a relationship that would require exclusion of Thompson from the jury for cause.
Prospective jurors Reynolds, Wilcox and Thompson were patients of Dr. Duplantis. Relationship as a patient with Dr. Duplantis is not good cause against Dr. Pittman, particularly in light of the dismissal of Dr. Duplantis as a defendant. All three stated on examination that each would judge the case fairly and impartially. Another prospective juror, Motichek, had been a Pittman patient in the past, but was not currently under his care. He also indicated that any relationship he had with the doctor would not affect his decision and that he would put his association with the doctor out of his mind.
The last prospective juror complained of was Ms. Huhn, who revealed *119 that she had been a patient of Dr. Duplantis and Dr. Pittman some six years prior to trial. No effort was made to distinguish the period of care rendered by Dr. Pittman from that of Dr. Duplantis. There was no evidence of a continuing patient-physician relationship. Initially, this prospective juror stated that she might find it difficult to reach a jury verdict and that her "relationship" might affect the decision. Under close questioning by the trial judge, however, she stated that she could be fair and impartial and render a verdict solely on the evidence. Such testimony is sufficient under the law to rehabilitate the juror, removing ground for a cause challenge. State v. McIntyre, 381 So.2d 408 (La.1980), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980). The judge, after questioning this juror, was satisfied that she could fulfill her duties. Once the obligations of a juror were made clear to her, she stated that she could act in accordance with the court's instructions. The test of competency is not an isolated statement made but rather an examination of all the testimony given and whether the juror demonstrates he or she can return a fair and impartial verdict. State v. Heard, 408 So.2d 1247 (La.1982). There is no showing that her relationship as a former patient would influence her in reaching a verdict.
Each of the prospective jurors complained of here stated clearly and under oath that their acquaintance or relationship, if any, with the doctor would have no effect on their decision in the case. These jurors were challenged peremptorily and excused. Under these circumstances, there is no showing of manifest abuse of discretion.
Of the jurors who actually deliberated the case, complaint is made of Baham, Williams, and Ms. Butscher. Jurors Baham and Williams were relatives of patients of the doctors. Baham's mother was a patient of Dr. Duplantis. Williams' brother-in-law was treated by Dr. Pittman. As stated above, no challenge for cause was made at trial to the relatives of patients. Both jurors stated that they could render an impartial verdict based solely on the facts presented at the trial.
Baham's wife was employed at the hospital. No challenge for cause to jurors married to hospital employees was made.
Ms. Butscher, who also served on the jury, was at the time of trial an employee of the pharmacy located in the hospital. She stated that she knew Dr. Pittman by sight only. She had no opinion of the doctor. Ms. Butscher was a temporary part-time employee who was working while completing her undergraduate degree. Her "contact" with Dr. Pittman was minimal, and she assured the Court that it would have no effect on her ability to judge the case based solely on the evidence presented. The hospital was not a party to the suit. [Further, the mere fact that a juror is employed by a defendant, without further showing, is not sufficient to exclude a juror for cause. Bernard v. Richoux, supra. In Bernard, the court held that it was not an abuse of discretion for the trial judge to refuse to excuse for cause a juror who was an employee of the defendant company in light of his answers on voir dire that his opinion would not be affected by that relationship.] All of the jurors demonstrated to the trial court's satisfaction that they could render a fair and impartial verdict.
Appellants also contend that the relationship of patient-physician is such that it creates a presumption that the juror-patient cannot render a fair verdict. Several out-of-state cases are cited in support of this proposition. These cases are inapposite. One factor that sharply distinguishes those cases from the present situation is that at the time of this trial, no juror in the instant case had a patient-physician relationship with Dr. Pittman. Thus, no juror was called upon to judge his own treating physician. Juror Baham's mother was a patient of Dr. Duplantis. Juror Williams' brother-in-law was treated by Dr. Pittman. Neither juror had a patient-physician relationship with the doctor.
As stated in State v. Gray, 351 So.2d 448, 455 (La.1977), "the mere existence of a *120 personal acquaintance between a prospective juror and the trial participants does not, without more, demonstrate a lack of fitness to serve as a juror." In the Gray case, the prospective juror was acquainted with the prosecutor and the defense attorney and had a business relationship with the prosecutor. A second juror was acquainted with the prosecutor. A third was the nephew of a deputy sheriff. The court concluded that the failure to excuse such jurors was not an abuse of discretion where all three stated that they could be impartial.

ISSUE NUMBER TWO: JURY COMPOSITION
Appellants next argue that the only reasonable explanation for the jury verdict is the alleged errors in panel selection, which resulted in improper jury composition, and ultimately an unfair verdict. As discussed above, that argument is without basis. Moreover, the record shows that the jury verdict is supported by the evidence adduced at trial. The jury concluded after hearing all of the testimony and receiving the instructions from the judge that Dr. Pittman had not been negligent in any aspect of the surgery and his care and treatment of this patient. After the verdict was rendered, appellants moved for a judgment notwithstanding the verdict or for new trial. The motions were argued, and later, reasons for judgment were issued, denying the motions.
It is a well-settled principle of Louisiana law that the findings of the trier of fact are not to be disturbed unless it can be shown that those factual conclusions are manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979).
The Court will not substitute its own evaluation of the evidence for the finder of fact's reasonable evaluation of the witnesses' credibility and reasonable inference of fact, since the jury, as the finder of fact, had the benefit of viewing the live testimony of the witnesses in reaching its verdict.
The jury in this case appears to have been properly instructed by the trial judge, and no issue was made of improper jury instructions.
Mrs. Seals was first seen in Dr. Pittman's office on December 17, 1979. She complained of recurrent and severe attacks of right upper quadrant abdominal pain and abdominal distension. She told the doctor that she had an intolerance of greasy or fried foods. It was also indicated that she had seen Dr. Montalbano in January, 1979, at Highland Park Hospital for similar complaints. Dr. Montalbano had diagnosed a gallbladder condition and discussed surgery with her. Additionally, the pain had been so severe one week prior to that incident that she had been seen in the emergency room. Following completion of the examination and discussion with the patient, Dr. Pittman advised that she should undergo a cholecystectomy, a removal of the gallbladder. Mrs. Seals agreed. At her request, the surgery was postponed until after Christmas.
The patient was admitted to St. Tammany Parish Hospital on December 27, 1979. Preoperative studies were performed including a cholecystogram. A gallbladder echogram subsequently performed was highly suggestive of chronic cholecystitis with gallbladder contracture.
The patient underwent surgery by Dr. Pittman on January 4, 1980, with Dr. Duplantis assisting. Prior to this procedure, Dr. Pittman had performed over 300 cholecystectomies in his 40 years of practice. The doctor proceeded, using standard technique. A mid-rectus incision was made. The tissues were examined and the gallbladder identified. Marked inflammatory changes were discovered. These changes were the result of years of gallbladder disease. The gallbladder was noted to be full of stones. Adhesions were present and obscured the surgical field. These adhesions partially obscured the gallbladder and involved surrounding tissue, including the liver.
As a result of the presence of these adhesions and scar tissue, the doctor surgically removed the tissue from the top surface *121 of the gallbladder. The gallbladder outline was defined by feeling around the edges of the organ. Due to the presence of the large amount of inflammatory scar and adhesion tissue, every portion of the ductal system could not be identified.
No difficulty was encountered in identifying the tapered gallbladder neck, where the cystic duct is attached. In the normal anatomy, the cystic duct is the only duct attached to the gallbladder and therefore has to be cut to remove the gallbladder. Dr. Pittman, therefore, elected to place slight retraction on the gallbladder and the cystic duct. A high ligation was made at the juncture of the cystic duct and the gallbladder. The cystic duct was then cut where it had been ligated close to the neck of the gallbladder. The gallbladder was surgically removed and turned over to the instrument nurse. No ductal material was present on the specimen other than the small nub of the cystic duct. No problems had been encountered to this point. Dr. Duplantis left the operating room.
Dr. Pittman then took postoperative X-rays to determine whether there were any stones in the ductal system. The first X-ray did not reveal the presence of any stones; however, it did not show the presence of the normal anatomic arrangement of the ductal system. The X-ray was repeated twice. The remainder of each of the cystic ducts and the common bile duct was evident, but there was no sign of the common hepatic duct which normally drains bile from the liver.
Dr. Ralph Meier, pathologist, was called to the operating room to examine the gallbladder specimen. This examination was conducted shortly after excision. Dr. Meier testified that he very carefully conducted a visual examination of the specimen which failed to reveal any evidence of ductal material other than the usual nub of the cystic duct attached to the specimen. Dr. Meier specifically stated that he directed his attention to determining whether the hepatic duct had been removed with the gallbladder but found no evidence of that. He then conducted microscopic examination of the specimen. No duct tissue other than the usual nub of the cystic duct was present. Dr. Meier concluded that, based on his experience and examination of the specimen, the patient did not have a normal hepatic duct. He found no other possible explanation for the abnormal physical findings.
After Dr. Meier examined the specimen, Dr. Pittman then began to search the surgical field for ductal tissue. No other duct was found. Finally, after an extensive search utilizing clean gauze a drop of bile was noted. A small frayed end of apparent duct was found attached to the underside of the liver. There was a gap of 3.5 centimeters between that end and the common bile duct.
Dr. Pittman then summoned another surgeon, Dr. Patrick Hunter, for assistance. Dr. Hunter was told of the absence of the hepatic duct. He also examined the surgical field closely, searching for any severed ductal material. None was found by him. Noting the gap between the distal portion of the common bile duct and the end of the hepatic duct, Dr. Hunter concluded that consultation with another surgeon was necessary. A phone call was placed to Dr. Francis Nance, Professor of Surgery at LSU Medical School, in New Orleans.
Dr. Nance advised placement of a temporary catheter to drain the liver, which was done. The patient remained at the hospital until January 10, 1980, when she was transferred to Hotel Dieu Hospital and follow-up care was provided by Dr. Nance.
Following the surgery, Dr. Pittman conducted medical research which revealed to him the existence of a rare anomaly never encountered before by Dr. Pittman in his career. Mrs. Seals had a variation from the normal anatomical arrangement of the biliary system. Instead of the normal hepatic duct, which comes out of the liver and drains into the common bile duct, this patient's hepatic duct drained directly into the gallbladder. This anomaly is known as a cholecystohepatic duct. This anatomic arrangement will function in a completely normal fashion until the gallbladder is removed. *122 This anomaly is rare, having been reported in only a few cases. The jury assessed the totality of the evidence and obviously concluded that Dr. Pittman's testimony was reliable and credible.
In order for the jury to render the verdict reached in this case, it must have concluded that the doctor was not negligent in performing the operation. In short, the jury must have found that there was no improper surgical removal of the common hepatic duct, as claimed by the plaintiffs; but rather, that the complications were due to the presence of a congenital anomaly.
In addition to Dr. Pittman, Drs. Seymour Ochsner, radiologist, Ralph Meier, pathologist, Arthur Axelrod, surgeon, and Burt Moor, surgeon, testified on defendants' behalf. Each doctor testified that in his opinion, based on the medical evidence available and their own personal knowledge, this rare congenital anomaly was the cause of the complications. Drs. Axelrod and Moor testified that in their opinions, as general surgeons, there was no breach of the standard of care.
Specifically, the following testimony supports the jury verdict:
Dr. Meier, a stipulated expert in pathology, stated that he had carefully examined the surgical specimen and found no evidence of severed duct other than the usual short nub of the cystic duct. The anatomy of the ductal system is well known and easily identifiable to Dr. Meier, who specifically searched the specimen for the common hepatic duct and could not locate it. Microscopic examination of tissue submitted did not reveal the presence of any hepatic duct material. He thus concluded that the hepatic duct had not been removed with the gallbladder.
Dr. Ochsner of Ochsner Foundation Hospital, accepted as an expert in radiology, testified that he had examined the cholangiograms (X-rays) taken postoperatively and concluded that the films were consistent with the presence of the subject anomaly. The films showed no evidence that the common bile duct was severed as plaintiffs alleged. He also concluded that there was no evidence that the patient ever had a normal common hepatic duct. Dr. Ochsner's review of the films showed that the cystic duct had been cut where a surgeon normally does so. It was his opinion, based on the films, that this patient did not have a normal anatomy. No evidence of a tear or stump was present at the point where the common hepatic duct normally joins the other two ducts. If the ducts had been erroneously cut at that point, there would have been an extrusion of contrast material not present here. Thus, Dr. Ochsner was of the opinion that the patient had a congenital anomaly, not a normal anatomy.
Dr. Axelrod, a stipulated expert in general surgery with twenty-five years' experience, stated that he was of the opinion that Mrs. Seals had a cholecystohepatic duct. He was of the opinion that there was no surgical negligence. Dr. Axelrod fully explained the normal anatomy to the jury and then gave his reasons for concluding that Mrs. Seals had such an anamoly. Dr. Axelrod also noted that this is a very rare anomaly which a surgeon would not expect to encounter. Dr. Axelrod also reviewed the X-rays, which support his conclusion about a cholecystohepatic duct. Dr. Axelrod concluded that the cystic duct had been cut at the usual and proper place and that the operation had been performed in the proper manner.
Dr. Axelrod also stated that it was not malpractice to be unaware of the presence of this rare anamoly before removing the gallbladder. Standard procedure does not call for X-ray visualization of the gallbladder and ducts before the removal if the doctor is satisfied with the identification of the cystic duct. It is a much safer procedure and acceptable under all appropriate standards for the surgeon, in the presence of fibrous, scar or inflamed tissue, to approach the cystic duct by following it down from the neck of the gallbladder, rather than attempting to identify each portion of the ductal system.
Dr. Moor, a practicing general surgeon in Omaha, Nebraska, was called as a witness *123 by Dr. Pittman because he is one of the few physicians in this country who has encountered the same congenital anomaly. Dr. Moor's review of the hospital records and postoperative films led him to conclude that Mrs. Seals had a cholecystohepatic duct. Dr. Moor noted that the film showed a tapering remainder of the cystic duct flowing gradually into a larger common duct, which would not be the case if there had been a transection of the common bile or common hepatic ducts. Dr. Moor also noted from the testimony of Drs. Pittman, Meier and Hunter that no ductal structure other than the nub of the cystic duct was ever identified either on the removed gallbladder or in the surgical field.
Dr. Moor stated that there was no reasonable way for Dr. Pittman to detect the presence of the abnormal anatomy before removing the gallbladder. The standard of care does not require dissection of all scar tissue down to the level of the cystic and common bile duct juncture. The risk of injury to ducts, arteries and veins enmeshed in the adhesions would not warrant such procedure. The important thing is to identify the cystic duct because that is the only duct that has to be cut, as was done in this case. The presence of such an extremely rare anomaly would not be anticipated and therefore injury to this small and abnormal hepatic duct upon removal of the gallbladder was unavoidable.
Dr. Nance, the subsequent treating surgeon, also testified that this particular anomaly would be rare and that he would be surprised to encounter it. He stated on cross-examination that what he had seen on examination of the patient later was compatible with such an anomaly. He further explained that there was a section of missing duct which might not have been there in the first place. He noted that even with the best of care, unexpected complications can arise.
Dr. Haddow, one of the appellants' experts, admitted that the surgery chosen was the appropriate treatment. He further stated that he would expect, if a transection of the common bile duct occurred, that the duct would remain attached to the specimen and be readily identifiable by a qualified pathologist.
Dr. Curreri, appellants' other expert, stated that he could not say whether or not the patient had a normal anatomy. He also stated that in the case postulated by the appellants, the piece of severed duct would remain attached to the specimen, but that was not the case here.
The jury was presented with differing opinions regarding the standard of care. It then assessed those opinions and reached its conclusion. An examination of the record reveals that the jury's verdict is supported by ample expert testimony that Dr. Pittman was not negligent. There is no indication of the manifest error required to overturn the jury's verdict.
Appellants urge that the doctrine of res ipsa loquitur should apply to this case. A charge regarding that the doctrine of res ipsa loquitur was given. The jury rejected the idea that there was any surgical negligence, concluding instead that the complications suffered were the direct result of the congenital anomaly. It is well established that the mere fact there was an unsatisfactory result does not establish negligence. Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35 (1963); Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954). Further, that the doctrine of res ipsa loquitor does not apply where other reasonable explanations for the complications are present. The evidence here clearly points to another such explanation other than surgical negligence. The evidence before the trier of fact clearly furnishes a reasonable basis for the conclusions reached by the jury. Under these circumstances, great weight must be given to the jury's verdict. There has been no showing of manifest error.

ISSUE NUMBER THREE: INFORMED CONSENT
Mrs. Seals consented in writing to the gallbladder operation. She signed the consent form routinely provided by St. *124 Tammany Parish Hospital before surgery. Although the consent form did describe the operation and mention there were risks generally, it did not list the specific risks required by La.R.S. 40:1299.40. As a result, the written consent form executed by Mrs. Seals does not answer the question as to whether her consent was informed.
The issue of informed consent was squarely presented to the jury by plaintiffs' counsel in his closing argument and by the trial judge in his jury instructions. In rendering a verdict for the defendant, the jury must have concluded that (1) there was no negligence in performing the operation (i.e., the complications resulted from a rare congenital anomaly rather than surgical negligence) and (2) there was no lack of informed consent (i.e., the risk of such a rare anomaly was so remote that it did not require disclosure and/or the patient would have still consented to the operation even if aware of such a slight risk). These conclusions of the jury are not clearly erroneous; and therefore, must be affirmed. Arceneaux v. Dominigue, supra.
Lacaze v. Collier, 434 So.2d 1039 (La.1983), is the leading case on the subject of informed consent. In the absence of a valid written consent, the patient must prove that (1) a "known" risk of the procedure was not disclosed, (2) the undisclosed risk actually occurred, and (3) a "reasonable patient" would have withheld his consent if advised of that specific risk. 434 So.2d at 1045-1047. The plaintiffs in this case failed to prove the necessary requirements.
The Supreme Court in Lacaze recognized "risks so rare or remote that they would not be considered `known' risks under the statute...." 434 So.2d at 1047. As the Court explained, a physician is not required to disclose every conceivable risk no matter how rare or remote, because that would, in many instances, be counterproductive to medical treatment. 434 So.2d at 1045. The particular risk involved in this case falls into this category.
The experts testified that a hepatic duct that is attached to the gallbladder instead of the common bile duct is a rare anomaly. Dr. Pittman had never before encountered or even heard of a cholecystohepatic duct like this in his forty years of surgical practice. Mrs. Seals' congenitally abnormal duct was an anatomical rarity.
Because it was so rare, Dr. Pittman had no duty under Lacaze to disclose the remote risk of such an anomaly. The plaintiffs' own expert, Dr. Curreri, said that he would not have bothered to advise the patient of this particular risk or the risk of any kind of injury to one of the ducts. In concluding that Dr. Pittman was not negligent, the jury must have concluded that the patient had an abnormal hepatic duct attached to the gallbladder, and that it was inadvertently removed with the gallbladder. The only risk that came to pass in this case was the risk of injury to an abnormal cholecystohepatic duct attached directly to the gallbladder.
Therefore, as applied to this case, Lacaze states the threshold question as follows: Did Dr. Pittman have any duty to warn Mrs. Seals of the remote possibility she might have one of the few cholecystohepatic ducts that exist in the world? Lacaze does not impose such a duty under these circumstances, and the jury apparently agreed there was no duty.
It was also incumbent on the plaintiffs under Lacaze to prove that a "reasonable patient" would have refused the surgery if advised of such a rare and remote risk. That is a question for the trier of fact to decide. 434 So.2d at 1048. In this case, the jury obviously rejected Mrs. Seals' testimony that she would have withheld her consent, and concluded instead that a "reasonable patient" would have undergone the surgery even if aware of this particular risk. The record supports that conclusion. Mrs. Seals consulted two different physicians, Dr. Montalbano and Dr. Pittman about her severe abdominal pain, which became so bad that she went to the emergency room approximately one week prior to her office visit. Mrs. Seals testified as follows:

*125 Q Mrs. Seals, going back to December of 1979 when you saw Dr. Pittman in his office, how would you characterize the pains that you were feeling at that time? Were they mild or severe or what?
A Pretty severe.
Q Was this a constant type of pain?
A At that time, yes.
Q Had it gotten so bad at one point that you had gone to the emergency room at the Slidell hospital?
A Yes. Off and on I had been having attacks and I had one bad attack that night and I went to the emergency room with it.
Q You went in the middle of the night to the emergency room?
A Yes.
Q Was that emergency room close to where you live?
A Well, it's not that close. About fifteen miles.
Q And Mr. Seals drove you there?
A Yeah.
Q And how long was that before you saw Dr. Pittman in his office?
A About a week, I think. The doctor on duty told me that I should see my family physician, and at that time I didn't have one because Dr. Montalbano had quit doctoring.
Surgery is clearly the treatment of choice for a painful gallbladder condition like Mrs. Seals had and is usually successful in relieving the patient's symptoms. By comparison, the risk of complications from a congenitally abnormal cholecystohepatic duct is extremely remote. That particular risk was significantly smaller than the risk in Lacaze which held that such a risk would not have caused a "reasonable patient" to refuse the surgery. Given the severity of Mrs. Seals' pain and the remoteness of the specific risk that occurred, the jury was justified in concluding that a "reasonable patient" would have still consented to the gallbladder operation even if advised of that risk.
Because the plaintiffs failed to prove two essential elements required by Lacaze to establish a lack of informed consent, the jury's verdict on this point is proper and will not be disturbed.

ISSUE NUMBER FOUR: COMPROMISE AGREEMENT
Appellants assert that they are entitled to enforce a "compromise agreement" allegedly reached by the parties through their respective counsel. The record clearly indicates that the letter written by St. Paul was rejected tacitly when by its own terms it expired on October 26, 1984. Appellants subsequently proposed settlement in a counteroffer which included payment of court costs. Settlement discussions were held. Ultimately, Dr. Pittman declined to settle. The case was submitted to the jury and verdict in favor of the defendants was rendered. Motion to enforce the settlement was heard by the trial court, and denied with reasons, on January 23, 1985. The court concluded that the specific requirements of the codal provisions governing compromise and settlement had not been fulfilled. Compromise had not been reached.
Appellants contend that Louisiana Civil Code article 2291 (now article 1853) governs this situation and that the actions of counsel in chambers constituted a judicial confession. A judicial confession pursuant to the article is an official admission of adverse factual elements made by a party. It is an express acknowledgment by a party in the proceedings in the trial court of the validity of the opponent's claim made in such a way as to leave no issue to be tried. Martin v. Holzer Sheet Metal Works, Inc., 376 So.2d 500 (La.1979).
In order for the statement and actions of counsel to be interpreted as an admission these acts must occur within the judicial proceeding in open court. If the agreement to settle is reduced to judgment and consented to by counsel, there is a confession of judgment. All cases finding such a confession involve the agreement of *126 counsel in open court on the record to the terms of a settlement. Martin, supra; Kleiner v. Ciko, 417 So.2d 54 (La.App. 1st Cir.1982), writ denied, 420 So.2d 457 (La. 1982). Unlike the cases relied on by appellants, no recitation of the terms of settlement was dictated by the trial judge and agreed to by all counsel in the instant case. Martin, supra; Davis v. Hooker Chemical & Plastic Corporation, 394 So.2d 802 (La. App. 4th Cir.1981).
Appellants further contend that since a client speaks through counsel any statement is an admission. Such statements, to constitute a judicial confession, must be made in the court proceedings. The record is devoid of any evidence that counsel assented to the terms of a settlement in open court. There is no judicial confession in this matter. Civil Code Article 2291 is inapplicable to the case at bar.
A transaction or compromise "must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding." La.C.C. art. 3071. Neither situation exists in the instant case. The letter containing the original settlement offer by its own terms had expired. Plaintiffs countered with an offer which included payment of court costs. After discussions with the doctor, the counteroffer was rejected. Plaintiffs now contend that there was a settlement agreement embodied in the expired offer, subject to the modifications they sought. There is no merit in this contention. Plaintiffs did not consent to the settlement offer but rather rejected it tacitly, and made a counteroffer which was not accepted. There was no compromise. To make a settlement judicially enforceable, it must either be reduced to writing or recited in open court. Troxclair v. Parish of St. Charles, 450 So.2d 759 (La.App. 5th Cir.1984).
Under the law of Louisiana, no valid, enforceable settlement of this claim was reached and there was no judicial confession or compromise. The ruling of the trial court was correct.
For the reasons assigned, the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.
JOHN S. COVINGTON, J., dissents with written reasons.
JOHN S. COVINGTON, Judge, dissenting.
Since I am a firm believer in the American jury system I loathe overturning that "institution's" findings of facts. However, faced with the realization that mortals are not infallible I realize there are rare occasions where, as a reviewing court, we should do so. This case, in my opinion presents that situation.
A thorough re-reading of the testimonies has convinced me that Dr. Pittman's actions fell well below the standard of care required of his medical specialty. First, as I appreciate the "expert" testimony, both for plaintiff and defendant, all agree that anomolies do exist in the anatomy of mankind and all physicians, whether general or specialist, are acutely aware thereof. Secondly, when a surgeon is engaged in "open field" surgery, the cardinal rule is you don't "cut" until you visualize what you are "cutting". As I appreciate the defendant's testimony he admits violation of this rule. In my opinion the plaintiffs have thus established their case by that degree of proof required by our jurisprudence.
For the foregoing reasons, I most respectfully dissent.

ON APPLICATION FOR REHEARING
GROVER L. COVINGTON, Chief Judge, and WATKINS, Judge, specially concurring in the denial of rehearing:
Although we do not think that an appellate court should comment on the denial of a rehearing application ordinarily, the line on page 7 of appellants' brief that this "case should not be whitewashed" and other language on that page warrant our further discourse.
*127 We can understand counsel's keen disappointment. After the jury verdict went against them, they attempted to revive an alleged compromise, thus trying to obtain a court policy of "two bites at the apple" or "heads, I win; tails, you lose."
In the penultimate paragraph on page 7, counsel attempts to ascribe some nefarious design to the ultimate composition of the court which heard this case. After the case was originally argued before our regular 3-judge panel, one of our members, Judge Shortess, felt that he should recuse himself because he and his wife had a claim against the same insurer, St. Paul's, having to do with hospital malpractice or medically related products liability. That case has not been finally resolved, having been appealed by the insurer at this time.
While the other two of us felt that Judge Shortess could disassociate himself from any prejudice, bias or personal interest in the case sub judice, his wishes were honored. Through error, the case was then assigned to be heard by a 5-judge panel. Since such an assignment is not in accordance with 1974 Const. Art. 5, § 8, it was properly designated to be, and was, heard and decided by a 3-judge panel.
The intemperate language to which we allude in the first paragraph hereof is unwarranted and could be treated as contumelious conduct. Counsel for appellants were apparently unaware of, or chose to ignore, the last paragraph of Uniform RulesCourts of Appeal, rule 2-12.4. Such disdainful language in a future filing will almost certainly not go without imposing proper sanctions.