568 So.2d 651 (1990)
James D. ANDRES, Sr., Helen Celestine and Ethel Lee Carter and Bordelon Leasing, Inc. (Intervenor), Plaintiff-Appellant (James Andres, Sr.) Appellees,
v.
LIBERTY MUTUAL INSURANCE COMPANY, Glazer Wholesale Drug Company of New Orleans, Inc., Defendants-Appellees.
No. 89-305.
Court of Appeal of Louisiana, Third Circuit.
October 3, 1990.
*652 Robert K. Guillory, Lafayette, for plaintiff-appellant.
Bruce A. Gaudin, Opelousas, for plaintiff-appellee. Borello & Giardina, Keith A. Giardina, Baton Rouge, for defendants-appellees.
Before DOMENGEAUX, C.J., and FORET and KNOLL, JJ.
KNOLL, Judge.
Plaintiff, James D. Andres, Sr., appeals a jury award of only $24,000 for injuries received in a motor vehicle accident. On appeal, Andres contends the jury erred in: 1) awarding only $4,000 for loss of earnings; 2) awarding only $5,000 for pain and suffering; and, 3) awarding only $15,000 for medical expenses. Also, Andres contends the trial court erred in allowing defendant, Liberty Mutual Insurance Company (Liberty Mutual), to introduce evidence of a worker's compensation settlement and accompanying medical reports and to question him about the purported inadmissible evidence.
Defendants, Glazers and Liberty Mutual, answered the appeal requesting a decrease in the award for medical expenses.

FACTS
This litigation concerns an automobile accident which happened in Lafayette on January 31, 1986. The defendants in this action are Glazers Wholesale Drug Company of New Orleans, Inc. (Glazers), the owner of the delivery truck which struck the Andres vehicle, and Liberty Mutual, the liability insurer of Glazers. At trial, the defendants stipulated liability. Therefore, the only issue to be resolved was the valuation of damages.
The evidence adduced at trial reveals that Andres' vehicle was rear-ended by a Glazers delivery truck in Lafayette. Andres and two friends, Helen Celestine and Ethel Carter, were riding in the vehicle at the time of the accident. Immediately following the accident, Andres was treated at a local hospital for a bloody nose and released three hours later.
On February 3, 1986, Andres saw his family physician, Dr. John C. Dugal, a general practitioner, with complaints of lower back and neck pain, pain in the left hand and pain and numbness in the left leg. Dr. Dugal noticed decreased left achilles reflex and admitted Andres to a Lafayette hospital for evaluation and treatment. Dr. Dugal's diagnosis was a cervical lumbofacial pain syndrome and cervical spondylosis with right neuroforamen encroachment at C5-6.
On cross examination, Dr. Dugal admitted that the results of both a CT scan and a lumbar myelogram were normal. Also, he conceded that cervical spondylosis is a normal *653 finding for a man of Andres' age (52 yrs.). In March 1986, Andres was again hospitalized for five days for the back pain. At Dr. Dugal's request, Dr. S. Goldware, a neurosurgeon, examined Andres and opined that he may have a L4-5 herniated disc and recommended a myelogram and a CT scan of the lumbar area. Meanwhile, Dr. Dugal continued to treat Andres for the lower back pain and numbness.
Andres was also examined by Dr. Louis C. Blanda, Jr., an orthopaedic surgeon. An examination revealed no specific nerve deficit. Andres had good strength in his legs and normal reflexes but exhibited a limited range of motion of the spine and had muscle spasms in the lumbar area. A neurological examination was normal and Andres had no dermatome pattern to support his complaints of numbness. Dr. Blanda recommended a discogram but Andres refused the procedure.
Dr. John Jackson, a neurosurgeon, examined Andres on April 10, 1986, for lower back pain which radiated into the left leg and foot and weakness and numbness of the left leg. Andres also complained of pain and swelling in the upper thoracic area, pain in the left shoulder and numbness in the fingers. A straight leg raising test produced pain at 90 degrees in the left leg. No muscle spasm was detected in the back and a lumbar myelogram was normal. Dr. Jackson noted the degenerative condition at C5-6 and opined that it is possible that the accident caused the neck and upper extremity symptoms. However, given the normal neurological examination and the normal lumbar myelogram, Dr. Jackson emphasized that the C5-6 degenerative condition is not responsible for the rest of his complaints. In his estimation, Andres is fit to drive an automobile and work as a car salesman.
On February 16, 1987, Dr. Fred C. Webre, an orthopaedic surgeon, examined Andres for complaints of neck pain and numbness and weakness in the left arm and hand. Dr. Webre performed an Adson test, Patrick test and a Babinski reflex testall of which produced normal results. Andres had no muscle spasm and no limitation of motion in the shoulders, elbows, wrists or hands. Andres' gait was normal and his legs were equal in size and length. He had no weaknesses in the upper extremities and cervical vertebrae X-Rays showed slight narrowing of the C5-6 interspace with minimal spurring on the foramina on the right side. Dr. Webre opined that the narrowing and spurring of the C5-6 interspace was a normal finding for a person of Andres' age (52 yrs.). Moreover, Dr. Webre felt that Andres did not have a herniated disc and that he was capable of gainful employment.
Dr. Charles Roland Billings, an orthopaedic surgeon, examined Andres on August 14, 1987, and observed no objective evidence of any neurological impairment or muscle spasm. Dr. Billings did notice degenerative joint and disc disease in the lower lumbar and cervical spine areas and narrowing of the disc space at L5-S1 and L2-3 but attributed these conditions to part of the normal aging process. He speculated that the accident was probably responsible for the onset of symptoms which had previously been asymptomatic. In his estimation, Andres suffered a whiplash-type injury of the cervical spine with lumbar strain superimposed on a formerly asymptomatic degenerative joint and disc disease.
After conservative treatment was unsuccessful, Dr. Billings began administering periodic facet injections in the lumbar region for pain and prescribed an anti-inflammatory medication. Although Andres experienced significantly less pain, Dr. Billings warned him of engaging in activities such as crawling under automobiles which might aggravate his condition and increase the pain.
Regarding his loss of income, Andres testified that at the time of the accident, his used car business was flourishing. He explained that his automobile sales company began as a part-time business in the front yard of his home. However, by 1984, his sales had increased and he was forced to move his growing business to a commercial location in Lafayette.
In addition, Andres entered into a business arrangement with Charthouse, Inc., a *654 national restaurant corporation with its regional office in Lafayette, whereby he would locate prospective buyers for their company vehicles removed from service. In exchange for a purported $550-$700 cash sales commission, Andres would pickup Charthouse vehicles from a Lafayette parking garage, throughly clean, inspect and, if necessary, repair these vehicles. He would display the vehicles at his used car lot and once a buyer was located, Andres would contact Charthouse and the sale was perfected at the Charthouse office where the certificates of title were kept. The sales were direct from Charthouse to the buyers.
According to Andres, his car sales in 1984 had risen to 20 cars per month. However, his 1984 income tax return shows an income of $16,847 and by his own admission fails to include cash commissions, if any, received from Charthouse. In 1985, his monthly sales purportedly increased to 30 vehicles, primarily due to the increase in sales of Charthouse vehicles. Other than testimony from several witnesses and himself, Andres had no business records[1] to substantiate his estimated earnings of $63,000 in 1985. Andres explained that he had no records of Charthouse vehicle sales since Charthouse sold directly to the buyers and his used car business was operated entirely on a cash basis including the payment of the employees' salaries and the sales commissions received from Charthouse.
Beth Breaux, a former employee of Charthouse, estimated that in 1985 Andres sold between 30-50 Charthouse vehicles per month with a commission of $500 per vehicle. Huey Thomassee, a former manager of a local finance company, testified that each month during 1985 he would procure 10-15 car loans from persons who purchased vehicles from Andres. Patrick Domingue, a manager of a Lafayette finance company, testified that approximately 5 people per month would secure loans for vehicles purchased with Andres. However, none of these witnesses corroborated their testimony with records from their respective companies. In addition, Ramee Castille, the head security officer at a Lafayette parking garage, estimated that in 1985, Andres would pick up approximately 30 vehicles per month from the Charthouse regional office.
Betty Thomassee, an employee of Confidential Investigative Associates, testified that she contacted Andres, an acquaintance of 5 years, in June of 1988 to sell a friend's automobile. According to her, Andres was still selling automobiles and instructed her to bring the car to his home. According to Thomassee, Andres informed her that as soon as the present case was settled, he would reopen his used automobile sales business again. However, once she arrived with the automobile, Andres changed his mind and stated that he no longer sold used automobiles.
Lastly, Andres' son, Joseph Darrel Andres, testified that his father sold approximately 20 Charthouse automobiles per month during 1985. He was a full-time worker at his father's used car business and testified that his father handled all of the business records. After his father's accident, Darrel continued the business but soon closed it because Charthouse officials stopped supplying vehicles.
After considering the evidence, the jury awarded Andres the following amounts:

General Damages: $5,000.00
Loss of past earnings: $4,000.00
Loss of future earning capacity: -0-
Past Medical Expenses: $15,000.00
Future Medical Expenses: -0-
 TOTAL: $24,000.00

LAW
Andres' first assignment of error concerns the jury award of only $4,000 for loss of earnings. On appeal, Andres contends the award of $4,000 for loss of past earnings and no award for loss of future earning capacity were inadequate.
Our review of damage awards granted by the trier of fact is narrow. The reviewing court should not disturb the trier's *655 award absent an abuse of discretion. Trahan v. Thomas, 544 So.2d 695 (La.App. 3rd Cir.1989). In determining whether the trier of fact has abused its discretion in its award, the appellate court must look first, not to prior awards, but to the individual circumstances of the case before it. Reck v. Stevens, 373 So.2d 498 (La.1979).
Our Supreme Court has stated:
"The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said."
Rosell v. Esco, 549 So.2d 840, 844 (La. 1989).
In the case sub judice, there was conflicting evidence regarding Andres' loss of earnings due to the accident.
Glynn Hebert, a vocational rehabilitation specialist, reviewed all of the medical depositions and concluded that Andres could be employed as an automobile salesman or as an office worker in any business office. Hebert emphasized that the restrictions placed on Andres' activities by Dr. Billings would not interfere with his work duties as an automobile salesperson or an office worker.
Jan Warren Dugar, an economics expert, testified that assuming the 1985 profit and loss statement is correct, Andres' loss of earnings from the time of the accident to the date of trial totaled $164,703.00. However, on cross examination, he recalculated the figures to $4,000 loss of earnings based on the assumption that Andres was earning $16,000 per year when the accident occurred and that he was unable to work as an automobile salesperson for three months.
After considering the evidence, the jury awarded Andres $4,000 for loss of earnings. Apparently, the jury was convinced that Andres earned a yearly income of $16,000 and was unable to work only for three months. While we may not have arrived at the same figure if we considered the issue de novo, given the several permissible views of the evidence and the restricted scope of our review, we cannot say that the trier of fact abused its discretion in its decision.
Next, Andres contends the jury erred in awarding only $5,000 for pain and suffering.
The primary considerations in assessing damages are the severity and duration of the injured party's pain and suffering. LSA-C.C. Art. 1999, Miller v. Winn-Dixie Stores, Inc., 527 So.2d 989 (La.App. 3rd Cir.1988), writ denied 531 So.2d 763 (La.1988). In addition, we must concentrate on the particular injuries involved and the effect of those injuries on the particular plaintiff involved without first resorting to prior jurisprudence. Highlands Ins. v. Missouri Pacific R. Co., 532 So.2d 317 (La.App. 3rd Cir.1988), affirmed, 540 So.2d 287 (La.1989).
In the case sub judice, Andres was 51 years of age at the time of the accident. Andres suffered a bloody nose in the accident and immediately felt sharp pain in his leg and neck. He was transported by ambulance to the local hospital and was released three hours later. Since then, he has seen numerous physicians with complaints of neck, back and leg pain and numbness. Dr. Dugal observed decreased left achilles reflex, but the results of both a CT scan and lumbar myelogram were normal. Dr. Blanda noted muscle spasm and a limited range of motion of the spine, but *656 found no neurological deficiencies. Dr. Jackson also found no muscle spasm and a lumbar myelogram was normal. Dr. Webre performed several reflexive and objective tests and concluded that Andres was capable to return to his former employment. Dr. Billings performed several tests and concluded that Andres had suffered a whiplash-type injury.
As the trier of fact, the jury is free to make credibility judgments of witnesses, believe or disbelieve testimony of witnesses and ultimately, place a value on the plaintiff's damages. Considering the diversity of the evidence, we cannot say that the jury was manifestly erroneous in awarding $5,000 for Andres' pain and suffering.
In his next assignment of error, Andres contends the jury erred in awarding only $15,000 for past medical expenses. As part of this assignment, Andres also contends the jury's unreasonably low award resulted from the trial court's exclusion of Andres' medical bills totaling $22,550.79 from evidence on hearsay grounds. Defendants contend that the award for medical expenses is excessive.
Hearsay is defined as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LSA-C.E. Art. 801(C).
In Jones v. Ledet, 383 So.2d 1308 (La. App. 3rd Cir.1980), this Court reversed the trial court's ruling and excluded from evidence as hearsay in a default proceeding medical bills from several physicians, several pharmacies and a hospital.
However, in recent cases where medical bills were offered into evidence at the trials on the merits, this court has consistently allowed it as admissible evidence. See, Johnson v. Bellefonte Ins. Co., 449 So.2d 1134 (La.App. 3rd Cir.1984), writs denied, 456 So.2d 164, 165 (La.1984); Guillory v. Shelter Mut. Ins. Co., 542 So.2d 850 (La. App. 3rd Cir.1989). Concluding that the medical bills were not hearsay and therefore, admissible, we reasoned: "The fact of her treatment is proven by her testimony and not by the medical bills. The medical bills were offered to prove the cost of treatment." Guillory, supra at 852.
In the case sub judice, the record shows that the trial court erroneously excluded the medical bills from evidence. At trial, Andres testified about the total amount of medical bills, but was prohibited from testifying about each individual bill. Andres should have been allowed to introduce the medical bills after laying the proper foundation for its admission. Therefore, in reviewing the correctness of the jury award, we will consider the proffered medical bills.
We find the jury manifestly erred in not awarding the full medical expenses incurred by Andres in connection with this accident. The record supports that the total medical expenses incurred by Andres was $22,550.79, which was supported by hospital and medical bills. This is the amount that should have been awarded; therefore, we will amend the judgment to increase the medical expenses incurred from $15,000 to $22,550.79.
Andres' final assignment of error concerns whether the trial court erroneously allowed into evidence a worker's compensation settlement and accompanying medical reports and testimony. Defendants contend the extrinsic evidence is admissible to attack Andres' credibility and impeach his prior testimony.
It is a well established rule of law that an objection to evidence must be made at the time of its offering and failure to do so constitutes a waiver of the objection. Thibodeaux v. Western World Ins., Co., 391 So.2d 24 (La.App. 3rd Cir.1980). Moreover, a party may, by some affirmative act done after the ruling on the evidence, be estopped from complaining about admitted evidence. Pitts v. Bailes, 551 So.2d 1363 (La.App. 3rd Cir.1989), writs denied, 553 So.2d 860 (La.1989) and 556 So.2d 1262 (La.App.1990).
A review of the record shows that on cross examination, defendants elicited testimony from Andres concerning a prior worker's compensation suit and settlement. In addition, certain medical reports *657 detailing the extent of his injuries were admitted into evidence over Andres' objection. However, the record clearly shows that on redirect examination, Andres' counsel questioned Andres about the nature of the accident which prompted the worker's compensation suit and the extent of his injuries. A party cannot object to the admission of evidence wherein that party later elicits the same evidence during trial. Therefore, the trial court did not err in allowing this testimony.
For the foregoing reasons, the judgment of the trial court is amended to increase the medical expenses from $15,000 to $22,550.79. In all other respects the judgment of the trial court is affirmed. Costs of this appeal is assessed one-half to appellant and one-half to appellees.
AFFIRMED AS AMENDED.
NOTES
[1] At trial, a profit and loss statement for 1985 prepared by an accountant employed by Andres' counsel was admitted into evidence not as a business record, but only as Andres' impression of the total sales in 1985.