657 So.2d 713 (1995)
In re MEDICAL REVIEW PANEL on behalf of Lisa R. Laurent.
94 CA 1661.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
*715 Joseph H. Simpson, Amite, for plaintiff-appellee Lisa R. Laurent.
James R. Strain, Jr., Slidell, for defendants-appellants Dr. James C. Hess and Louisiana Medical Mut. Ins. Co.
Before LeBLANC, PITCHER and FITZSIMMONS, JJ.
PITCHER, Judge.
In this medical malpractice action, defendants, Dr. James Hess and Louisiana Medical Mutual Insurance Company, appeal from a jury's verdict that found Dr. Hess liable for an unwanted conception of plaintiff's, Lisa R. Laurent, third child when he failed to perform a requested tubal ligation. We affirm.

*716 FACTS
After learning that she was pregnant, Lisa R. Laurent (Ms. Laurent) began prenatal care with Dr. James Hess on May 14, 1991. Ms. Laurent testified that during one of her prenatal visits with Dr. Hess, she requested that a tubal ligation be performed in conjunction with the delivery of her baby.
On the night of December 26, 1991, Ms. Laurent telephoned Dr. Hess at his residence and informed him that her water had broken and appeared reddish in color. Dr. Hess testified that the description by Ms. Laurent of what had occurred sounded like Ms. Laurent's membranes had ruptured. Ms. Laurent was instructed to meet Dr. Hess at the Seventh Ward Hospital.
Upon arriving at the hospital, Ms. Laurent filled out the necessary papers for admittance, which included a medical procedure form giving Dr. Hess authority to perform a vaginal delivery and a tubal ligation. After his arrival at the hospital, Dr. Hess examined Ms. Laurent and assessed the leakage of bloody type fluid. Because of this leakage, Dr. Hess was concerned that placenta previa or abruptio placenta, which are the two major causes for this type of leakage, may be occurring. At this point, the process of fetal monitoring was enacted and several tests were performed on Ms. Laurent. The test results were normal, and Ms. Laurent was in stable condition. Thereafter, Ms. Laurent was placed in a hospital room where her condition was monitored by Dr. Hess throughout the night.
During the course of the night, the bloody fluid leakage continued. In the early morning hours of December 27, Ms. Laurent was completely dilated, with an increase in the amount of leakage. At this point, Dr. Hess became concerned that the abruption was becoming worse and decided to go to the delivery room to perform a vaginal delivery by forceps.[1] This attempt at vaginal delivery was unsuccessful, and Dr. Hess observed signs which indicated that the abruption may be worsening. At this time, Dr. Hess told Ms. Laurent that a Cesarean Section (C-section) would be the best mode of delivery. A second medical procedure form authorizing Dr. Hess to perform a C-section was signed by Ms. Laurent.
Dr. Hess testified that he considered the C-section to be urgent and elected to perform a primary C-section which is a vertical skin incision. While performing the C-section, Dr. Hess removed the placenta and noted that a 30 to 40 percent abruption of the placenta had occurred. Dr. Hess testified that prior to completing the C-section, he told Ms. Laurent that he was concerned about whether the baby was going to do well and that it was best not to do a tubal ligation at this time. Ms. Laurent testified that she does not recall having this conversation with Dr. Hess.
Dr. Hess stated that after the C-section, no physical problems developed with either the baby, Daniel, or Ms. Laurent. Thereafter, Ms. Laurent remained in the hospital for a brief period of time, and Dr. Hess made several visits to her hospital room for check-up purposes. Following the hospital stay, Ms. Laurent and her baby were released to go home, with a follow-up visit scheduled for four weeks later.
Ms. Laurent testified that after her release from the hospital, she visited Dr. Hess's office twice before her scheduled four week follow-up visit. Ms. Laurent testified that on neither occasion was she informed by Dr. Hess that the tubal ligation was not performed. Dr. Hess testified that his records indicated that only one office visit occurred after Ms. Laurent's release from the hospital and before her scheduled four week visit. Dr. Hess also testified that on this visit, a nurse could have seen Ms. Laurent instead of him.
Ms. Laurent stated that the four week follow-up visit never occurred because she, along with her husband, moved to California. In May of 1992, while living in California, Ms. Laurent became sick and began experiencing a lot of weakness. Ms. Laurent went to see a doctor and learned that she was *717 pregnant with her third child, Dallas. Ms. Laurent testified that since she told the doctor that she had a tubal ligation, the doctor felt that she may be pregnant in the tubes and referred her to a specialist. Ms. Laurent was seen by a specialist who performed a ultrasound, and told Ms. Laurent that she was pregnant in the uterus and there was no way that a tubal ligation had been performed on her. Ms. Laurent testified that it was at this point that she learned for the first time that a tubal ligation had not been performed.

PROCEDURAL BACKGROUND
Ms. Laurent filed a medical malpractice complaint with the Patient Compensation Fund against Dr. Hess. With regards to this complaint, Dr. Hess filed a petition for Discovery Docket in civil court on September 3, 1992. Subsequently, the parties agreed to waive the medical review panel procedure. On February 2, 1993, Ms. Laurent filed a petition of intervention in Dr. Hess's civil matter and set forth a claim for damages for wrongful conception, alleging medical malpractice.
A jury trial was held on December 14-16, 1993. After Ms. Laurent presented all of her evidence, Dr. Hess moved for a directed verdict, alleging that Ms. Laurent failed to establish the standard of care required of Dr. Hess. The trial court denied this motion for directed verdict. Subsequently, after Dr. Hess presented all of his evidence, Ms. Laurent filed a motion for directed verdict, alleging that Dr. Hess failed to prove any contributory negligence on the part of Ms. Laurent. Ms. Laurent's motion for a directed verdict was denied by the trial court.
After the trial, the jury found Dr. Hess negligent and assessed 85 percent of the fault to him. The jury also found negligence and causation on the part of Ms. Laurent and assessed her with 15 percent of the fault. The jury awarded general damages in the amount of $95,000.00, which included a $15,000.00 award for loss of enjoyment of life and $15,000.00 for emotional and mental distress. Special damages were also awarded in the amount of $10,700.00.
Dr. Hess filed a motion for judgment notwithstanding the verdict and a motion for new trial, alleging that the evidence presented did not establish any standard of care relevant to Dr. Hess and did not support a conclusion that he deviated from a relevant standard of care. Dr. Hess further alleged that some of the items of damages were not recoverable in a wrongful conception case.
Ms. Laurent also filed a motion for judgment notwithstanding the verdict, alleging that the court should have granted a directed verdict in her favor regarding the issue of contributory negligence on her part. In her motion, Ms. Laurent requested an increase in special damages to the exact amount of the medical bills and submitted into evidence these medical bills.
After a hearing on both of these motions, the trial court amended the jury verdict to increase special damages for medical expenses from $10,700.00 to $10,938.31, and the trial court further ordered the reversal of the jury's finding that Ms. Laurent was 15% at fault, and concluded that Dr. Hess was 100% at fault. Thereafter, upon the request of Ms. Laurent, court costs were assessed against Dr. Hess and Louisiana Medical Mutual Insurance Company. The judgment also denied Dr. Hess's motions for a judgment notwithstanding the verdict and for a new trial. Dr. Hess and Louisiana Medical Mutual Insurance Company now appeal and allege the following assignments of error:
1. The trial court abused its discretion in excluding potential jurors on the basis of religion and/or in permitting the potential jurors to remain on the panel despite their association with plaintiff's counsel.
2. The trial court erred when it denied defendant's Motion for Directed Verdict, Motion for Judgment Notwithstanding the Verdict and/or Motion for New Trial when at the close of plaintiff's case, there was insufficient evidence to support a finding by a preponderance of the evidence, that any standard of care was established relative to Dr. Hess' treatment of plaintiff or that Dr. Hess deviated from the relevant standard of care.
3. The trial court improperly allowed the jury to consider "loss of enjoyment of life" and "emotional and mental distress *718 since recovery from delivery and in the future" as separate elements of damages when the Louisiana Supreme Court in [Pitre v. Opelousas General Hospital,] 530 So.2d 1151 (La.1988) did not allow those categories as separate elements of damages.
4. The trial court erred in granting defendant's Judgment Notwithstanding the Verdict and/or Motion for New Trial, thereby overturning a jury finding that plaintiff was 15 percent (15%) contributorily negligent.
5. The trial court abused [it's] discretion when it assessed unreasonable costs incurred by plaintiff against defendants.
6. The trial court erred in allowing trial by ambush by permitting plaintiff to refer to a treating physician during the course of her direct examination and to use [a] medical textbook not listed in her answers to interrogatories on requests for production of documents.
7. The trial court erred in not reducing the amount of the judgment when the damages awarded to plaintiff were clearly excessive.

ASSIGNMENT OF ERROR NUMBER ONE
Through this assignment, Dr. Hess contends that the trial court abused its discretion in excluding potential jurors by challenges for cause based on religion and by denying his challenge for cause of prospective jurors who had personal and/or business ties with Ms. Laurent's counsel.
LSA-C.C.P. art. 1765 provides the grounds for a challenge for cause in a civil trial:
Art. 1765. Challenges for cause
A juror may be challenged for cause based upon any of the following:
(1) When the juror lacks a qualification required by law;
(2) When the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial;
(3) When the relations whether by blood, marriage, employment, friendship, or enmity between the juror and any party or his attorney are such that it must be reasonably believed that they would influence the juror in coming to a verdict;
(4) When the juror served on a previous jury, which tried the same case or one arising out of the same facts;
(5) When the juror refuses to answer a question on the voir dire examination on the ground that his answer might tend to incriminate him.
It is a well settled principle of law that the trial judge is vested with broad discretion when ruling on challenges for cause. Seals v. Pittman, 499 So.2d 114, 118 (La.App. 1st Cir.1986), writs denied, 503 So.2d 15 (La.1987); 503 So.2d 1021 (La.1987); cert. denied, 484 U.S. 840, 108 S.Ct. 126, 98 L.Ed.2d 84 (1987). Only when the record demonstrates a clear abuse of discretion should the appellate court intervene. The trial judge is obviously in the best position to assess the juror's demeanor, sincerity, fairness and credibility. Thus, his decision is not subject to disturbance by appellate action without a showing that there was a clear abuse of discretion. Seals v. Pittman, 499 So.2d at 118. In determining whether the trial court abused its discretion, it is proper to review the voir dire as a whole.
The record reflects that prospective jurors Clay Laiche, Ruth Naquin, and Wallace P. Jennings all expressed strong beliefs against the use of birth control or voluntary sterilization. Mr. Laiche stated that he was a Roman Catholic and did not believe in birth control or voluntary sterilization. Mr. Laiche also stated that he believed in planning a family but not by any artificial means. In addition, Mr. Laiche's response to the question of whether or not he could set aside his religious beliefs and apply the law, was "All I can tell you is that I will try. I'll do my best."
Mrs. Naquin stated that she would have a problem because she was a Roman Catholic and did not believe in birth control or voluntary sterilization, but she could set aside her religious convictions and apply the law. During further questioning, Mrs. Naquin stated that she had mixed feelings about the case because she has "two adopted children; I would give everything I owned for a baby, *719 and I don't feel that any baby should be unwanted." Mrs. Naquin also stated that she did not know if she could award general damages for an unwanted baby.
In reference to his beliefs about birth control and voluntary sterilization, Mr. Jennings stated that he was in the same boat as Ms. Naquin because he also was a Roman Catholic. Mr. Jennings further stated that he felt the same way as Mrs. Naquin about awarding general damages for an unwanted baby.
During the jury selection process, Ms. Laurent challenged Mr. Laiche and Ms. Naquin for cause on several bases, which included their strong beliefs against birth control and the fact that they were Catholic. After considering the arguments of each counsel, the trial court granted Ms. Laurent's challenges for cause and excused both Mr. Laiche and Ms. Naquin. Thereafter, on its own motion, the trial court excused Mr. Jennings. During a subsequent granting of a challenge for cause of a juror other than those mentioned above, the trial court made the following statement:[2]
Let me note for the record too, that Mr. Simpson [Ms. Laurent's counsel] is making arguments relating to the fact that these respondents are Catholic. My reasons for granting the challenges are not religiously oriented.
The fact that he's Catholic is irrelevant, but the fact that he has very, very strong personal religious beliefs against birth control, against sterilization, and against what amounts to the meat and potatoes of this lawsuit, leaves me to question his judgment in this particular case. I do not think he is an appropriate juror in this particular case.
That's my reasoning, not because he's Roman Catholic.
Clearly, the record reflects that the trial court considered more than just the fact these prospective jurors were of the Roman Catholic faith. We note that the record reflects that the foreperson of the jury, Larry Frederick, was also a Roman Catholic. After a review of the voir dire examination as a whole, we cannot say that the trial court abused its discretion in excusing the prospective jurors.

Personal or Business Relationship With Attorney
Dr. Hess also contends that the trial court abused its discretion by denying Dr. Hess's challenges for cause of prospective jurors who had personal and/or business ties to Ms. Laurent's counsel.
More specifically, Dr. Hess makes this contention in reference to prospective jurors Hulon Mashon, Jesse Mixon and Charles Stevens. However, the record reflects that no challenges for cause were made at trial based on Mr. Simpson's (Ms. Laurent's counsel) relationship with either Mr. Mixon or Mr. Mashon.[3] These issues of personal relationships with Mr. Simpson were not raised at trial and are not preserved for purposes of appellate review. See Seals v. Pittman, 499 So.2d at 118.
Nevertheless, Dr. Hess did challenge for cause prospective juror Charles Stevens based upon his relationship with Mr. Simpson.
A prospective juror's friendship or acquaintance with one of the attorneys involved in the case does not warrant the granting of a challenge for cause if the prospective juror makes it clear that such a relationship would not affect his or her verdict. Stapleton v. Great Lakes Chemical Corporation, 616 So.2d 1311, 1316 (La.App. 2nd Cir.1993), aff'd in part, vacated in part, 627 So.2d 1358 (La.1993). Nor does a prospective *720 juror, having previously employed an attorney or his law firm on an unrelated legal matter, by itself, necessitate the granting of a challenge for cause. Stapleton v. Great Lakes Chemical Corporation, 616 So.2d at 1316.
Mr. Stevens stated that Mr. Simpson represented his wife a couple of years ago in a personal injury case. Mr. Stevens stated that if Mr. Simpson did not convince him with evidence and testimony, he would be able to rule against Mr. Simpson. Mr. Stevens also stated that he would not feel that he owed Mr. Simpson any explanation whatsoever.
During the jury selection process, Dr. Hess challenged Mr. Stevens for cause based upon his relationship with Mr. Simpson. After hearing both counsel's arguments on this challenge, the trial court denied the challenge for cause. In denying the challenge for cause, the record reflects that the trial court considered not only the statements made by Mr. Stevens but also his credibility. Therefore, we are unable to find an abuse of discretion in the trial court's denial of the challenge for cause against Mr. Stevens.

ASSIGNMENT OF ERROR NUMBER TWO
Through this assignment of error, Dr. Hess argues that the trial court erred in not granting his motion for a directed verdict, motion for judgment notwithstanding the verdict (JNOV), and/or his motion for new trial when, at the close of Ms. Laurent's case, she failed to present sufficient testimony to establish the standard of care relative to Dr. Hess's treatment of her.
The standard for determining whether to grant a directed verdict or JNOV is set forth in Bush v. Cannata's Supermarket, Inc., 612 So.2d 794, 797 (La.App. 1st Cir.1992), as follows:
On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence not just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
A motion for new trial should be granted when the verdict is clearly contrary to the law and evidence and, in any case, if there is good ground therefor. See LSA-C.C.P. arts. 1972 and 1973. Louisiana jurisprudence is clear that a new trial should be ordered when the trial judge, exercising his or her discretion, is convinced by his or her examination of the facts that judgment would result in miscarriage of justice. Bush v. Cannata's Supermarket, Inc., 612 So.2d at 797.
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991). Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hospital, 582 So.2d at 1276.
Louisiana jurisprudence has held that expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge, or failed to exercise reasonable care and diligence. Martin v. East Jefferson General Hospital, 582 So.2d at 1277. The determination of an expert's credibility is also a factual question subject to the manifestly *721 erroneous/clearly wrong standard of review. Martin v. East Jefferson General Hospital, 582 So.2d at 1277.
In this case, Dr. John Tarnasky, an OB-GYN and Ms. Laurent's medical expert, testified that Dr. Hess fell below the standard of care [or was negligent] by not performing the tubal ligation when the procedure had been requested, consent forms for the procedure had been signed, and the progress notes stated that the patient [Ms. Laurent] desired this procedure.
Dr. Tarnasky also stated that Dr. Hess fell below the standard of care [or was negligent] by not notifying Ms. Laurent that the procedure had not been performed. According to Dr. Tarnasky, immediately after the delivery, Ms. Laurent should have been notified that the tubal ligation was not performed. Dr. Tarnasky stated that after the C-section, or during one of several visits to Ms. Laurent's room, Dr. Hess should have informed her about not performing the tubal ligation.
Dr. Kenneth Holloman, a California OB-GYN and a defense witness, testified that if a doctor agreed to do a tubal ligation; then failed to do the procedure for whatever reason; and failed to inform the patient, who later became pregnant, would be below the standard of care expected of an OB-GYN in California.
Dr. Hess testified that based upon his operative summary, after a discussion with Ms. Laurent, he opted not to do tubal ligation because he did not know if the baby was going to do well. Dr. Hess further testified that his reasons for not performing the tubal ligation was because of the urgency of the delivery, concern about the baby, and ambivalence expressed by Ms. Laurent during their discussion regarding the tubal ligation.[4] In addition, Dr. Hess stated that during a patient's four week follow-up visit, if the patient had a tubal ligation, then at this time, he would have discussed the procedure with the patient. Dr. Hess stated that Ms. Laurent failed to keep this four week appointment.
Based upon the evidence, we find that the Ms. Laurent set forth sufficient evidence to meet her burden of proof as to the standard of care required of Dr. Hess. Further, we conclude that the trial court was correct in its denial of the motion for directed verdict, motion for judgment notwithstanding the verdict, and motion for new trial.

ASSIGNMENT OF ERROR NUMBER THREE
By this assignment of error, Dr. Hess asserts that the trial court improperly allowed the jury to consider "emotional and mental distress since recovery from delivery and in the future" and "loss of enjoyment of life" as separate elements of damages when the Louisiana Supreme Court in Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988), did not allow those categories as separate elements of damages.
The Louisiana Supreme Court dealt with the issue of wrongful conception in the Pitre case and set forth damages that parents are entitled to recover. The Supreme Court concluded that:
... [P]arents upon proper proof may recover for the expenses incurred during pregnancy and delivery, the mother's pain and suffering, the father's loss of consortium, service and society, and their emotional and mental distress associated with the birth of an unplanned and unwanted child and the unexpected restriction upon their freedom to plan their family. These damages were foreseeable consequences of the doctor's alleged negligent acts and omissions.
Pitre v. Opelousas General Hospital, 530 So.2d at 1161-1162.
The Supreme Court further concluded that:
[P]laintiffs [Parents] cannot recover for the economic costs of rearing an unplanned and unwanted child, expenses of the change in family status, including extra money to compensate for the fact that the mother must spread her society, comfort, *722 care, protection and support over a larger group, money to replenish the "family exchequer" so that the child will not deprive the other family members. These are ordinary vicissitudes that befall any family with the birth of a healthy, normal child. Absent unusual circumstances, a child is presumed to be a blessing not offset by the inconvenience of redistributing the family income and patrimony which he or she may occasion.
Pitre v. Opelousas General Hospital, 530 So.2d at 1162.
Clearly, Pitre permits the recovery of damages for emotional and mental distress associated with the birth of an unplanned and unwanted child. Pitre does not place a limitation upon the time frame of the emotional and mental distress that a parent is entitled to recover. The only limitation on the damages for emotional and mental distress is that these damages be associated with the birth of the unplanned and unwanted child. Therefore, we find that the element of damages for emotional and mental distress, since recovery from delivery and in the future, is within the ambit of damages permitted by Pitre.
Another contention of Dr. Hess, in this assignment of error, is that Pitre does not allow recovery for "loss of enjoyment of life."
General damages are those which may not be fixed with any degree of pecuniary exactitude but which involve mental or physical pain and suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Angeron v. Martin, 93-2381, p. 3 (La.App. 1st Cir. 12/22/94); 649 So.2d 40, 43. Loss of enjoyment of life is separate and independent from physical pain and suffering. See Stewart v. Select Insurance Company, 93-666 (La.App. 3rd Cir. 2/2/94), 631 So.2d 599, writ denied, 94-0545 (La. 4/22/94); 637 So.2d 159.
Considering the fact that "loss of enjoyment of life" can be a separate item of damages, we do not find that the Supreme Court intended that the recoverable damages set forth by Pitre to be an exclusive list of damages recoverable in a wrongful conception case. In addition, we find that the evidence presented by Ms. Laurent was sufficient to warrant damages for the "loss of enjoyment of life through pregnancy, delivery and recovery".
The evidence shows that Ms. Laurent's mother, Beverly Ann Ricotta, testified that during Ms. Laurent's pregnancy, Ms. Laurent was depressed and cried all the time. Ms. Laurent also testified that she was shocked once she found out about the pregnancy and continued to be in shock throughout her pregnancy. Additionally, the trial court, in its jury charges, instructed the jurors on damages for the loss of enjoyment as well as the items of damages listed in Pitre.[5]
Based upon the evidence, we conclude that trial court was correct in allowing the recovery of damages for loss of enjoyment of life through pregnancy, delivery, and recovery.

ASSIGNMENT OF ERROR NUMBER FOUR
Through this assignment of error, Dr. Hess contends that the trial court erred in granting Ms. Laurent's motion for a judgment notwithstanding the verdict and/or motion for new trial, and thereby overturning the jury's finding that Ms. Laurent was 15 percent contributorily negligent.
In Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991), the Louisiana Supreme Court held that:
A JNOV [Judgment Notwithstanding the Verdict] is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the *723 moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e., do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
In assessing the case using the criteria set forth, we hold that the trial court was not erroneous in granting the JNOV as to the apportionment of fault. We find, as did the trial court, that the facts and inferences point so strongly and overwhelmingly in favor of Ms. Laurent, that reasonable jurors could not have found Ms. Laurent at fault in any way. In granting the JNOV, the trial court stated the following:
.... I do not believe that there is any viable theory of the defense wherein the plaintiff could have been comparatively negligent in this medical malpractice case. The only theorythere were two possible theories advanced; the first was that the plaintiff [Ms. Laurent] somehow, should have known of the advice of the physician while she was on the operating table and while undergoing the C-section, that the tubal ligation would not be performed.
The fact that the jury found that ... the defendant [Dr. Hess] was negligent, under those circumstances, in my view, would negate any comparative negligence under those circumstances. In other words, they either believed that the doctor told her or he didn't tell her.
The second theory was that in some fashion, the plaintiff did not take affirmative action after the surgery, in order to ascertain through follow-up visits or otherwise, that the tubal ligation had in fact been performed.
I find specifically, as a matter of law, that there was no duty on the part of the plaintiff [Ms. Laurent] to so affirmatively ascertain, consequently, as a matter of law, comparative negligence cannot be assessed under those circumstances.
So, the request for JNOV is granted, deleting the comparative negligence assessed to the plaintiff [Ms. Laurent] and finding the defendant doctor [Dr. Hess] and health care provider negligent in the sum of one hundred percent [100%].
Therefore, given the record before us, we cannot say that the trial judge erred in granting Ms. Laurent's motion for JNOV requesting that Dr. Hess liability be increased to 100 percent.

ASSIGNMENT OF ERROR NUMBER FIVE
In this assignment of error, Dr. Hess contends that the trial court abused its discretion by assessing him with Ms. Laurent's frivolous and unreasonable costs. He argues that some of the expenses assessed in regards to Dr. John Tarnasky, Ms. Laurent's expert witness, were unreasonable.
While it is a general rule that the party cast in judgment should be taxed with costs, the trial court may assess costs of a suit in any equitable manner. See LSA-C.C.P. art. 1920; Polk Chevrolet v. Webb, 572 So.2d 1112, 1116 (La.App. 1st Cir.1990), writ denied, 575 So.2d 394 (La.1991). Upon review, a trial court's assessment of costs can be reversed by this court only upon a showing of an abuse of discretion. Polk Chevrolet v. Webb, 572 So.2d at 1116. A prevailing *724 party may be taxed with the costs of litigation, if that party in some way incurred additional costs pointlessly or engaged in other conduct which justified an assessment of costs against it. Polk Chevrolet v. Webb, 572 So.2d at 1116.
After a review of the record, we find that the trial court abused its discretion in its assessment of costs to Dr. Hess for Dr. Tarnasky's expenses for his hotel bill and meals. The record reflects that Dr. Tarnasky stayed in a New Orleans hotel as opposed to a hotel in Amite, Louisiana, where the trial occurred. Dr. Tarnasky stayed at the New Orleans Marriott for a rate of $119.00 per night with a room tax of $16.09 per night. The record also reflects that on average, Dr. Tarnasky spent $60.00 per day on meals in New Orleans. We conclude that these expenses were pointlessly incurred. Further, we conclude that $60.00 per day would be a reasonable hotel expense and $45.00 per day would be a reasonable expense for meals. Thus, we conclude that costs assessed to Dr. Hess for Dr. Tarnasky's hotel bill should be reduced to the amount of $60.00 per day for four days, a total of $240.00, and the costs assessed for Dr. Tarnasky's meals should be reduced to the amount of $45.00 per day for four days, a total of $180.00.
Dr. Hess also contends that the trial court abused its discretion by assessing him with the unreasonable and frivolous cost for Dr. Tarnasky's expert witness fees in the amount of $5,975.00.
We find that there is no showing in the record that Ms. Laurent caused costs to be incurred pointlessly or engaged in other conduct justifying the assessment of costs against her. Accordingly, we find the trial court did not abuse its discretion in assessing the amount of $5,975.00 in expert witness fees to Dr. Hess.

ASSIGNMENT OF ERROR NUMBER SIX
By this assignment of error, Dr. Hess asserts that the trial court erred by allowing the testimony of Ms. Laurent in reference to seeing a psychiatrist when the psychiatrist was not listed in any discovery responses.
It is a well established rule of law that an objection to evidence must be made at the time of its offering and failure to do so constitutes a waiver of the objection. Andres v. Liberty Mutual Insurance Company, 568 So.2d 651, 656 (La.App. 3rd Cir.1990). Moreover, a party may, by some affirmative act done after the ruling on the evidence, be estopped from complaining about admitted evidence. Andres v. Liberty Mutual Insurance Company, 568 So.2d at 656.
In the case at hand, the record reflects that Ms. Laurent was asked the following question: "Now, have you, within the past since Dallas was born, have you been to see a psychiatrist?". Ms. Laurent response was "Yes, I have". At this point, Dr. Hess' counsel asked for permission to approach the bench, and the trial court granted this request. Thereafter, Ms. Laurent was further questioned but only on her reason for going to see a psychiatrist. The record does not contain an objection by Dr. Hess on either question about a psychiatrist. Thus, Dr. Hess' failure to object waives his right to complain on appeal.[6]
Dr. Hess also contends that the trial court erred in allowing defense witnesses to be cross-examined on a medical textbook that was not listed on the discovery list.
The record reveals that two defenses witnesses were questioned about information contained in a medical textbook. During the cross examination of Dr. Rick Grissoli, Mr. Strain, Dr. Hess' counsel, objected to the failure to lay a proper foundation for use of the medical book. The trial court sustained this objection, and Mr. Simpson, Ms. Laurent's counsel, asked a few questions in an *725 effort to lay the proper foundation, but through these questions, Mr. Simpson was able to get the testimony desired from Dr. Grissoli without further questioning about the medical book.
The second witness, Michael Heroman, was also questioned on cross examination about information contained in the medical textbook. Mr. Strain objected to Mr. Simpson's statement that the medical textbook was taught at Southeastern Louisiana University because there was no testimony that it was taught at Southeastern Louisiana University. Subsequently, Mr. Strain waived this objection and stated that Mr. Simpson could "go ahead and do it". At this point, Mr. Simpson read a passage from the textbook and questioned Mr. Heroman about the passage without objection from Mr. Strain. Additionally, Mr. Strain, on redirect, questioned Mr. Heroman further on the passage read from the textbook.
Based upon this evidence, we find that Dr. Hess did not object to the use of the medical textbook, and therefore, Dr. Hess waived his right to complain on appeal.

ASSIGNMENT OF ERROR NUMBER SEVEN
Through this assignment of error, Dr. Hess contends that the general damages awarded to Ms. Laurent were excessive.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court articulated the following standard for reviewing general damages awards:
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonable within that discretion.
(Citations are omitted).
After a thorough review of the record, we cannot say that the general damages awarded, in this case, were excessive.

CONCLUSION
For the foregoing reasons, the trial court's judgment assessing costs to Dr. Hess in the amount of $553.57 for Dr. Tarnasky's hotel bill is amended to the amount of $240.00, and the costs of $252.71 assessed for Dr. Tarnasky's meals is amended to the amount of $180.00. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants, Dr. Hess and Louisiana Medical Mutual Insurance Company.
AFFIRMED, AS AMENDED.
NOTES
[1] Dr. Hess testified that he had no personal recollection of Ms. Laurent's delivery but based his testimony on his records, which included an operative summary report of the events that occurred during the surgical procedure.
[2] At this time, prospective juror Kenneth Craft was challenged for cause by Ms. Laurent based upon his strong beliefs against birth control, the fact that he was Catholic, the fact that he lost his son, and the fact that he stated he would not want anybody on the jury in this type of case, if they felt like he did. We note that Dr. Hess does not allege error on the trial court's granting of this challenge for cause.
[3] The record shows that Dr. Hess peremptorily challenged Mr. Mashon and did not attempt to challenge him for cause. In regards to Mr. Mixon, Dr. Hess did not have any remaining peremptory challenges. At this point, the trial court asked either counsel if they wished to challenge Mr. Mixon or the remaining jurors for cause, and Dr. Hess did not challenge Mr. Mixon for cause.
[4] Although Dr. Hess maintained that one of the reasons the tubal ligation was not performed was because of the urgency of the C-section, Dr. Tarnasky opined, based upon his review of the records, that the C-section was not an acute emergency situation.
[5] While stating the law to the jury, the trial court made the following statement as to "loss of enjoyment of life"

Another factor for your consideration is called loss of enjoyment of life. One sustains this loss when the ability to enjoy life is impaired as a consequence of a negligent act of another.
[6] We note that Dr. Hess complains about a subsequent mentioning during Ms. Laurent's closing argument of her visit to a psychiatrist. However, the record reflects that Dr. Hess made no objection to this statement. Thus, Dr. Hess waived his right to complain on appeal. See Ogletree v. Willis-Knighton Memorial Hospital, 530 So.2d 1175 (La.App. 2nd Cir.), writ denied, 532 So.2d 133 (La.1988).