696 So.2d 88 (1997)
Rosemary Ackal MYERS, PlaintiffAppellant,
v.
William J. BROUSSARD, et al., DefendantsAppellees.
No. 96-1634.
Court of Appeal of Louisiana, Third Circuit.
May 21, 1997.
*90 Andre F. Toce, Lafayette, for Rosemary Ackal Myers.
L. Albert Forrest, S. Gerald Simon, New Iberia, for William J. Broussard et al.
Preston D. Cloyd, Lafayette, for State Farm Mut. Auto Ins. (as UM Carrier).
Before DOUCET, C.J., and PETERS and SULLIVAN, JJ.
PETERS, Judge.
The plaintiff, Rosemary Ackal Myers, filed this suit to recover damages for injuries sustained in an automobile accident, which occurred *91 in Iberia Parish, Louisiana, on August 9, 1991. A vehicle driven by William J. Broussard, one of the defendants, struck her vehicle, thereby causing the accident and her injuries. Ms. Myers named State Farm Mutual Insurance Company (State Farm) as a defendant both in its capacity as the liability insurer of Mr. Broussard and as the uninsured/underinsured motorist (UM) insurance carrier of her vehicle. She also asserted a claim for statutory penalties and attorney fees against State Farm for its alleged arbitrary and capricious handling of her claim.
A jury trial resulted in a $551,726.10 judgment in favor of Ms. Myers and against Mr. Broussard and State Farm in general and special damages. The claim for statutory penalties and attorney fees was tried to the trial judge and resulted in a judgment in favor of Ms. Myers and against State Farm of $10,500.00 in penalties and $183,908.00 in attorney fees. Mr. Broussard and State Farm appealed the general and special damage award; State Farm appealed the award of penalties and attorney fees; and Ms. Myers answered the appeals, seeking an increase in some of the amounts awarded.

DISCUSSION OF THE RECORD
Shortly after noon on August 9, 1991, Ms. Myers was on her lunch break from her employment with the Iberia Parish School Board and was driving a 1990 Nissan automobile on Louisiana Highway 674 in Iberia Parish. The Nissan was owned by her father and insured by State Farm. As she waited for traffic to clear at the intersection of Louisiana Highway 674 and Louisiana Highway 182, her vehicle was struck from behind by a 1987 Nissan truck driven by Mr. Broussard and also insured by State Farm. Ms. Myers testified that as a result of the impact, her chest and head struck the steering wheel and she immediately began to suffer pain in her head and right arm.
Ms. Myers initially sought treatment at the emergency room of the Iberia General Hospital and Medical Center (Iberia General) where she was examined by an emergency room physician and X rays of her cervical spine and right shoulder were taken. Ms. Myers testified that the emergency room physician informed her that she had sustained a separated shoulder. However, the radiology report found in the hospital records contains the notation that while there did appear to be a space defect in the acromioclavicular joint, "[i]t is not to the point of definite separation or dislocation." Ms. Myers was not admitted to the hospital, and the hospital records' discharge diagnosis was that she had sustained a strain of her cervical spine and right shoulder.
Ms. Myers was seen the next day by her family physician, Dr. Gerald Elias, a New Iberia, Louisiana general practitioner. Because Dr. Elias died before trial, the only evidence concerning his conclusions and treatment was derived from Ms. Myers' testimony and his office records. Ms. Myers testified that when she first saw Dr. Elias, she was extremely stiff, could barely walk, and was suffering from nausea and headaches. She also testified that Dr. Elias reaffirmed her understanding that she had sustained a separated shoulder and also informed her that she had sustained torn ligaments and was suffering from back and neck spasms. According to Ms. Myers, Dr. Elias provided her with a neck brace and a splint for her shoulder and prescribed pain medication and muscle relaxants.
Dr. Elias' office records were introduced by the defendants, and his son, Dr. Gerald James Elias, Jr., attempted to interpret these records. Most of the notations are illegible, but it is clear that Dr. Elias treated Ms. Myers on a regular basis from immediately after the accident through January of 1993.[1] The records also indicate that Dr. Elias ordered a bone scan of Ms. Myers' right shoulder which was performed at Iberia General on September 4, 1991. The radiology report indicated that the results were within normal limits.
*92 Dr. Elias referred Ms. Myers to Dr. Harold James Hebert, Jr., a New Iberia, Louisiana orthopedic surgeon, who first saw her for this accident on February 7, 1992. Dr. Hebert examined the emergency room X rays and concluded that they were negative in all respects, including the possibility of a separated shoulder.[2] Based on his examination of Ms. Myers and her prior medical records, he concluded that Ms. Myers was suffering from nothing more than muscular back pain which would resolve itself in time. On May 27, 1992, Ms. Myers again presented herself to Dr. Hebert, complaining of lower back pain. Dr. Hebert described the results of his examination on this occasion as being "dramatically negative." An MRI ordered by Dr. Hebert was performed on June 1, 1992, and Dr. Hebert described the results as "unequivocally normal." Based on these later tests and results, Dr. Hebert concluded that Ms. Myers was not suffering from any longterm disability.
Ms. Myers contends that she began to suffer from diarrhea and nausea immediately after the accident. According to her, she weighed 120 pounds at the time of the accident and dropped shortly thereafter to 102 pounds. The Iberia General medical records do not reflect Ms. Myers' weight on August 9, 1991. Ms. Myers' weight apparently became a concern to Dr. Elias as early as October of 1991 as he began to record it on every visit. On October 1, 1991, he recorded her weight as 119 pounds. Thereafter, her weight was always recorded as less than 119 pounds, with the lowest being recorded as 111 pounds on January 29, 1993. To explore the cause of this unexplained weight loss, Ms. Myers underwent a barium enema procedure at Iberia General on October 29, 1992, at the request of Dr. Elias. The test was negative for lesions and diverticulitis but inconclusive for the evaluation of early changes of colitis.
Since he had no medical explanation for her weight loss, Dr. Elias referred Ms. Myers to Dr. Perry Stokes, a New Iberia, Louisiana gastroenterologist and internal medicine specialist. Dr. Stokes first saw Ms. Myers on February 2, 1993, and recorded her weight as 114 pounds. At that time, according to Dr. Stokes, Ms. Myers complained of a thirty-pound weight loss, occasional diarrhea, and pain in her lower abdomen.
On March 11, 1993, Dr. Stokes ordered a battery of tests for Ms. Myers. These tests included a C.B.C. test for anemia or leukemia; a S.M.A.C. test, which screens for approximately twenty separate disorders; a urinalysis test; and both ultrasound and X rays of her lower abdomen to detect possible growths. All of these were within normal ranges, except that the urinalysis test was positive for the presence of a small amount of microscopic blood. On March 16, 1993, Dr. Stokes performed a flexible sigmoidoscopy to examine her lower colon. The results of this test also revealed no abnormalities. After evaluation of these test results and his examination of Ms. Myers, Dr. Stokes diagnosed Ms. Myers' condition as a stress-related functional disorder. He recommended diet modification and antispasmodic medication.
On March 25, 1993, Ms. Myers was hospitalized at Iberia General, complaining of abdominal pain. An X ray revealed that she had suffered the abrupt collapse of her right lung, which according to Dr. Stokes, is a common ailment for thin females. A surgeon performed a procedure to reinflate her lung, and Ms. Myers remained hospitalized for three days. On April 2, 1993, Ms. Myers was again admitted as an outpatient at Iberia General, dye was injected into her veins, and her kidneys were x-rayed. Again, the test results were basically normal.
Given the history related to him, his examination, and the results of his extensive testing, Dr. Stokes concluded that Ms. Myers' stress was a major contributing factor to her complaints of pain. While he would not initially say that more probably than not her stress was caused by the automobile accident, he did agree that it was possible. When asked to assume that the only significant stress in Ms. Myers' life were the injuries she sustained in the accident, he agreed *93 that more probably than not the stress was caused by the accident. Dr. Stokes last saw Ms. Myers professionally on April 5, 1993.
On referral by her attorney, Ms. Myers was seen professionally by Dr. Stuart Phillips, a New Orleans, Louisiana orthopedic surgeon. Ms. Myers first saw Dr. Phillips on April 8, 1993, at which time Ms. Myers complained to Dr. Phillips of headaches, back pain, difficulty with bowel and urinary functions, and pain associated with sexual activity. Although Ms. Myers did not complain of cervical discomfort, Dr. Phillips observed tingling and weakness in her right hand as he examined her. According to Dr. Phillips, the cervical area examination was normal, but the thoracic and lumbar area examination resulted in abnormal findings. Dr. Phillips determined that Ms. Myers was suffering from scoliosis of her thoracic spine and also observed moderate muscle spasm and a significant loss of motion in her lumbar area. X rays taken at this first examination were found to be within normal limits. Dr. Phillips' initial diagnosis was that Ms. Myers suffered from preexisting scoliosis which caused an early onset of degenerative arthritis in her back and that this arthritis was aggravated by the trauma of the accident. His prognosis concerning recovery was poor.
Dr. Phillips ordered an MRI, a CAT scan, and a range of motion study of the lumbar and thoracic regions of her spine. According to Dr. Phillips, the lumbar MRI revealed a bulging disc at the L4-5 level, while the lumbar CAT scan revealed calcification of ligaments. According to Dr. Phillips, this CAT scan finding merely confirmed his initial diagnosis. The MRI and CAT scan of the thoracic region revealed bulging discs at T5-6, T6-7, and T7-8. Dr. Phillips concluded from the results of a spinal motion analysis that Ms. Myers had lost eighty percent of the motion in her thoracic region and fifty percent in her lumbar region.
Dr. Phillips saw Ms. Myers approximately ten more times, with the last visit occurring in November of 1995. By the time he examined her on July 20, 1993, Dr. Phillips had concluded that Ms. Myers was not a candidate for surgery because of her myriad of problems, all of which he attributed to the injuries sustained in the automobile accident. He also concluded that part of her pain was a result of a fibromyositis condition, or inflammation of the muscles in the back. In his opinion, this condition was also caused by the automobile accident trauma and was probably permanent.
Dr. Phillips' treatment over the next two years continued to be a conservative approach of medication, physical therapy, and injections into spasm areas. He saw Ms. Myers in February and May of 1993; August and October of 1994; and May, August, and November of 1995. Over this period of time, he saw very little change in Ms. Myers' condition and concluded that her condition was permanent. In his opinion, her future treatment was in pain medication, muscle relaxants, sleeping pills, and physical therapy. Additionally, he was of the opinion that her condition would require medical consultation and/or treatment at least four times per year for the rest of her life.
On November 30, 1994, at the suggestion of her attorney, Ms. Myers sought treatment from Dr. Olga E. Reavill, an anesthesiologist and pain management specialist practicing in Mamou, Louisiana. Dr. Reavill testified that Ms. Myers' pain level was at ten, or the absolute worst level on the pain scale, when she first saw her. While much of the examination performed by Dr. Reavill resulted in normal findings, it was her opinion that Ms. Myers suffered from intense pain with the worst occurring at the T2 and T5 levels of her thoracic spine. Dr. Reavill's initial diagnosis was that Ms. Myers suffered from cervical facet syndrome, or inflammation of the small joints of her neck; inflammation in her thoracic spine at the T2 and T5 levels; and bilateral inflammation of two joints in her lower back. By review of X rays and Dr. Phillips' test results, she also concluded that Ms. Myers suffered from a disc bulge at the L4-5 level of her lumbar spine and the T4-5, T5-6, T6-7, and T7-8 levels of her thoracic spine.
Dr. Reavill recommended that Ms. Myers undergo a cervical facet block, wherein the physician inserts hypodermic needles into the cervical joints and injects medication. If that proved ineffective, then she recommended *94 that the procedure be followed by a Radio Frequency Thermocoagulation (RFTC) procedure. In this procedure, an electrode on the tip of a needle is inserted into the cervical joint and heat is applied by the electrode to the nerve endings. In the thoracic region, Dr. Reavill suggested a bilateral thoracic facet block followed by a RFTC procedure from T1 to T6 if the block were not effective. Concerning the lower back, Dr. Reavill suggested starting with a bilateral femoral nerve block by injection through the groin and hip area followed, not by the RFTC procedure, but by a cryoneurolisis procedure. This differs from the RFTC procedure in that the tip of the inserted needle can be used to produce heat or cold. All of these procedures required hospitalization on an outpatient basis and were performed at the Savoy Medical Center in Mamou.
On December 19, 1994, Dr. Reavill performed bilateral facet blocks from T1 to T6 and a right femoral nerve block. Ms. Myers reported to Dr. Reavill on January 5, 1995, that she was pain free in the lumbar and thoracic area for only three or four days, so Dr. Reavill decided to perform the RFTC procedure. A bilateral RFTC was performed in the thoracic area on January 17, 1995, and on January 26, 1995, Ms. Myers returned to Dr. Reavill, complaining of pain, a burning sensation, and soreness arising from the procedure. Otherwise, according to Dr. Reavill, Ms. Myers' other pain complaints in the thoracic area had subsided.
Ms. Myers returned on June 16, 1995, with marked improvement in the thoracic area but complaints of worsening pain in the cervical and lumbar area. On July 5, 1995, a RFTC procedure was performed on the L1 to L5 area. Ms. Myers reported on July 28, 1995, that her lumbar pain had been resolved. On August 2, 1995, a cervical facet block was performed, and according to Dr. Reavill, the patient left the hospital pain free except for the discomfort from the procedure itself. However, by August 16, 1995, the cervical pain had returned, and Dr. Reavill performed a cervical RFTC procedure. At the next visit, Dr. Reavill found Ms. Myers to still be suffering from cervical tenderness and headaches. Dr. Reavill found, as she had in the past, knots in Ms. Myers' neck and back, referred to as trigger points. According to Dr. Reavill, these trigger points are scar tissue or knots in the muscle and often must be injected directly to be defused.
As a result of the lack of success in the cervical area, Dr. Reavill decided to begin an epidural catheter series (ECS) of treatments. This treatment entails puncturing the spine and placing a catheter in the spine. The catheter is used to place dye for diagnostic purposes and to administer various drugs directly to the pain area. On September 26, 1995, Dr. Reavill performed an ECS treatment by puncturing the spine at the C7 level and placing a catheter from the C7 level to the C4 level. The catheter remained in Ms. Myers' spine for approximately twentythree hours during which time Dr. Reavill administered dye, anesthetic, steroids, and finally medication to break up the scar tissue. At a follow-up visit with Dr. Reavill on October 27, 1995, Ms. Myers' cervical pain had decreased, and Dr. Reavill observed only one trigger point.
When asked about future treatment, Dr. Reavill testified that she believed that Ms. Myers' lower back needed no additional treatment but that her thoracic and cervical areas still have serious problems. She felt that ultimately Ms. Myers will require a series of three thoracic epidural procedures as well as another cervical epidural procedure. If these are not successful, Dr. Reavill testified that a spinal cord stimulator might have to be permanently inserted and would require a lifetime of maintenance. In her medical opinion, all of Ms. Myers' medical problems were attributable to her injuries sustained in the accident.
Dr. Ted Friedberg, a Lafayette, Louisiana clinical psychologist and neuropsychologist, first saw Ms. Myers on November 15, 1994. At that time, she claimed to be suffering from depression and expressed numerous physical complaints. Dr. Friedburg administered the Minnesota Multiphasic Personality Inventory and Depression Inventory test to Ms. Myers. According to the doctor, the results revealed a valid profile which caused him to conclude that she was not a malingerer. It was Dr. Friedberg's opinion that Ms. *95 Myers needed counseling and relaxation training. On November 29, 1994, he explained his findings and recommendations to Ms. Myers. However, he did not see her again until August of 1995, at which time she had yet to follow his recommendations. Dr. Friedberg expressed his professional opinion that depression and emotional stress had exacerbated Ms. Myers' physical problems and that the automobile accident had been the major contributing factor in that stress.
Ms. Myers testified that she was born on January 15, 1965. Therefore, at the time of the accident, she was almost twenty-seven years old. She was employed at the Iberia Parish School Board office as a secretary. Although she continued to work after the accident, she was often absent because of her injuries and was not working at the time of trial. She had sustained a low back injury in 1987 but claims to have fully recovered prior to the accident which is the subject of this suit. Prior to this accident, Ms. Myers led a very active life. While in high school, she ran track, played volleyball, and served as a cheerleader. She interacted well with her five brothers, was very assertive, and was an excellent student. After high school and before this accident, she married and gave birth to two children. According to Ms. Myers, her mother, and other witnesses, Ms. Myers completely changed after this accident; she has been depressed and unhappy, her marriage has failed, and she has not even been able to travel short distances without pain. She cries often, and her physical and mental problems have significantly affected her ability to work. She also contends that as a result of this accident, she missed 347 days of work; had to hire people to clean her house and yard; was no longer able to participate in sporting activities or play with her children; and was no longer able to obtain health insurance.
After trial, the jury returned a verdict finding Mr. Broussard's fault to be the sole cause of this accident, and this finding has not been appealed. The dispute on appeal relates to the damage awards of both the jury and the trial judge. The jury awarded the following general and special damages:

1) Past medical expenses $ 29,376.10
2) Loss of past wages $ 17,350.00
3) Pain, suffering, and disability, both $ 300,000.00
 physical and mental (past, present
 and future)
4) Future medical expenses $ 100,000.00
5) Loss of future earning capacity $ 75,000.00
6) Loss of enjoyment of life $ 0
7) Loss of insurability $ 30,000.00
8) Loss of household services $ 0

The trial judge assessed State Farm with $10,500.00 in penalties and $183,908.00 in attorney fees pursuant to La.R.S. 22:658. The final judgment gave State Farm credit for the $8,506.08 that it had previously paid on the claim.
Mr. Broussard and State Farm, as Mr. Broussard's liability insurance carrier, have appealed, alleging that (1) the jury erred in awarding an excessive amount of damages to plaintiff and (2) the judge erred in taxing Ms. Myers' out-of-town and out-of-state expert witness expenses as court costs. State Farm, as the UM carrier for Ms. Myers' vehicle, has appealed, contending that the trial court erred (1) in finding that it had been arbitrary and capricious in its handling of Ms. Myers' claim for UM benefits and thereby awarding statutory penalties and attorney fees pursuant to La.R.S. 22:658 and in the alternative, (2) awarding Ms. Myers $183,908.00 in attorney fees, which amounts to one-third of the jury verdict, as such an award is excessive and not supported by the evidence. Ms. Myers has answered the appeal, alleging that the jury erred in (1) awarding her only $30,000.00 as compensation for loss of insurability; (2) awarding her only $75,000.00 as compensation for loss of future earning capacity; (3) failing to award her any sum for her loss of enjoyment of life; (4) failing to award her any sum for loss of household services; and that the trial court erred in failing to award her penalties and damages under La.R.S. 22:1220.

OPINION
To be entitled to recover damages, Ms. Myers must prove by a preponderance of the evidence that (1) she sustained injuries and (2) her injuries were caused by the accident. Revel v. Snow, 95-462 (La.App. 3 Cir. 11/2/95); 664 So.2d 655, writ denied, 95-2820 *96 (La.2/2/96); 666 So.2d 1084. The existence of injuries and the causation of those injuries are factual determinations which will not be disturbed on appeal unless they are manifestly erroneous. Id. However, once these determinations are made, the assessment of damages is subject to the abuse of discretion standard. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id. at 1261.
The appropriate test in assessing damages is whether, viewing the evidence in the light most favorable to the defendant, a reasonable trier of fact could have assessed damages as they were assessed. Revel, 95-462; 664 So.2d 655.

General Damages
General damages cannot be fixed with pecuniary precision because they involve mental or physical pain or suffering, inconvenience, loss of intellectual gratification, or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Craven v. Universal Life Ins. Co., 95-1168 (La.App. 3 Cir. 3/6/96); 670 So.2d 1358, writ denied, 96-1332 (La.9/27/96); 679 So.2d 1355. In reviewing awards for general damages, this court is not to decide what it thinks would have been an appropriate award under the circumstances but rather decide whether the award represents an appropriate exercise of discretion by the fact finder. Youn, 623 So.2d 1257. Each award must be analyzed on a case-by-case basis to determine whether it is adequate under the particular facts and circumstances presented by the case under review. Id. It should be noted that reasonable people will often differ on what they feel is a reasonable award for general damages. An appellate court should only raise or lower a general damages award when the award, in either direction, is beyond what a reasonable fact finder could assess for the effects of this particular injury on this particular victim under these particular circumstances. Id. With these legal precepts in mind, we turn to the evaluation of the general damage awards in the instant case.
The defendants contend that the $300,000.00 award to Ms. Myers for past, present, and future physical and mental pain, suffering, and disability is excessive, considering the nature of her injuries and the nature of the treatment she has received. At the same time, Ms. Myers contends that the jury erred in failing to award her compensation for loss of enjoyment of life. These are separate elements of damages which may be caused by a singular injury. In re Medical Review Panel on Behalf of Laurent, 94-1661 (La.App. 1 Cir. 6/23/95); 657 So.2d 713.
"The primary considerations in assessing damages are the severity and duration of the injured person's pain and suffering." Francis v. Brown, 95-1241, p. 13 (La. App. 3 Cir. 3/20/96); 671 So.2d 1041, 1049 [citing Andres v. Liberty Mutual Ins. Co., 568 So.2d 651 (La.App. 3 Cir.1990) ]. The defendants claim that the award is greatly disproportionate to "truly similar" injuries. They further claim that plaintiff exaggerated her suffering and injuries in her testimony. They point to her testimony where she claimed that she was unable to travel to Dr. Phillips' office in New Orleans without spending the night in Baton Rouge, and yet during the same time period, she traveled twice to Gulf Shores, Alabama, without stopping. Additionally, she admitted to flying nonstop to Turkey and participating in sightseeing excursions while there.
Other discrepancies in Ms. Myers' testimony pointed out by the defendants involve medical treatment she received. Ms. Myers claimed that the sigmoidoscopy took at least forty-five minutes, while the medical records reflect that it took only three minutes and *97 she was discharged nine minutes later. She also testified that she was not given any anesthesia when the chest tube was inserted to reinflate her collapsed lung, but once again, the medical records indicate to the contrary. Concerning her first treatment with Dr. Reavill, Ms. Myers testified that she was not given adequate sedation, that she began crying out, and that Dr. Reavill instructed the nurses to totally sedate her. Dr. Reavill testified that Ms. Myers' constant talking during the procedure interfered with her concentration and that was why Ms. Myers was given additional sedation.
While we recognize that these inconsistencies in the testimony exist, the jury had the opportunity to balance these inconsistencies against the other testimony and evidence presented. A reasonable fact finder could conclude that Ms. Myers sustained severe and disabling injuries, having long-range implications. Given the great or vast discretion accorded the jury's decision on damages, we do not find that the jury was manifestly erroneous in awarding $300,000.00, and we therefore find no merit in this assignment of error.
In asserting that the jury erred in failing to award damages for her claim for loss of enjoyment of life, Ms. Myers points to evidence favorable to her claim. She contends that as a result of the accident, she is no longer able to play with her children, lift weights with her brother, or participate in sports.
She further points out that the extensive medical history of depression and stress show that she has been deprived of life's basic pleasures. Although it does appear that Ms. Myers has lost some enjoyment of life following the accident, we are mindful of the fact that even though awards for certain elements of damages may be inadequate or excessive, if the total sum awarded is neither inadequate nor excessive, then the award should not be disturbed on appeal. James v. Webb, 94-162 (La.App. 3 Cir. 10/5/94); 643 So.2d 424, writ denied, 94-2670 (La.12/16/94); 648 So.2d 396. The sum of $300,000.00 awarded by the jury adequately compensates Ms. Myers for her general damages.

Special Damages
Special damages are damages which can be established with reasonable mathematical certainty. Stevens v. Winn-Dixie of La., 95-0435 (La.App. 1 Cir. 11/9/95); 664 So.2d 1207. In this case, the jury awarded such damages for past and future lost wages, past and future medical expenses, and loss of insurability. It rejected Ms. Myers' claim for loss of household services.
The defendants object to the award for both past and future loss of income. We find no error in the jury's conclusion. The plaintiff bears the burden of proving that she has suffered a loss of income. Carter v. State Farm Mut. Auto. Ins. Co., 548 So.2d 53 (La.App. 3 Cir.1989). Past lost wages are susceptible of being calculated with mathematical certainty from the proof offered at trial, and thus, such an award is an exception to the much discretion rule. Simar v. NOWCAM Servs., 617 So.2d 164 (La.App. 3 Cir.1993). However, the jury must have a reasonable basis for exercising its discretion, and the record must provide a factual basis for the award. Breaux v. Wal-Mart Stores, Inc., 93-1035 (La.App. 3 Cir. 4/6/94); 635 So.2d 667, writ denied, 94-1098 (La.6/24/94); 640 So.2d 1347.
The defendants contend that the $17,350.00 award for loss of past wages was in error. Normally, an analysis of an award for past wages of a salaried employee should be a straightforward mathematical calculation, but this record does not lend itself to such an analysis.
Ms. Myers testified that she was making $900.00 per month when the accident occurred, would have been making $1,200.00 per month at the time of trial if she had been working, and that her salary varied during the years between the accident and trial. Dr. Bernard Pettingill, Jr., an economist called to testify on behalf of Ms. Myers, calculated her past wage loss to be $18,450.00[3] based on testimony that Ms. Myers *98 had missed 347 days of work since the accident. The number of days missed was based on a document prepared by Wanda Luent who maintained the records for the school board. However, an examination of this document reveals that it is inaccurate in that weekends were listed as days absent in some months.[4]
Other evidence concerning Ms. Myers' pretrial income loss included her employee W-2 forms which reported the following amounts of actual wages paid:

1991 $ 9,025.58
1992 $11,562.53
1993 $12,386.90
1994 $11,101.10

When one calculates the difference between Ms. Myers' earning potential and actual wages paid for these periods, the difference equals $6,799.09.[5] Additionally, Ms. Myers contends that she did not work at all in 1995. At the time of trial, the loss for 1995 was $12,296.00.[6] The total of these two calculations is $19,095.09. The jury awarded less than either of these two calculations. Thus, it is obvious that the jury concluded that most, but not all, of Ms. Myers' absences from work were related to the accident.
The jury also awarded Ms. Myers $75,000.00 for her loss of future earning capacity. The defendants seek a decrease in this award, and Ms. Myers seeks an increase. Before Ms. Myers can recover for her loss of future earning capacity, she must prove the loss, not with mathematical certainty, but with reasonable certainty. Gauthier v. Kansas City S. R. Co., 96-529 (La. App. 3 Cir. 11/6/96); 682 So.2d 993, writ denied, 96-2918 (La.1/24/97); 686 So.2d 867. Future loss of earnings is inherently speculative and must be proven with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed. Perritt v. Commercial Union Ins. Co., 95-1274 (La.App. 3 Cir. 3/13/96); 673 So.2d 215, writ denied, 96-1751 (La.10/11/96); 680 So.2d 644. An award for loss of future earning capacity is not based merely upon the difference between the injured person's pre-accident wages and post-accident wages but rather it should be based on the difference between the injured person's earning capacity before and after the accident. Hollie v. Beauregard Parish Police Jury, 96-198 (La.App. 3 Cir. 8/28/96); 680 So.2d 1218.
In determining the proper amount to be awarded, the trier of fact should consider the injured person's age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation. Gauthier, 96-529; 682 So.2d 993. Our review of this award is governed by the manifest error standard. Veazey v. State Farm Mut. Auto. Ins., 587 So.2d 5 (La.App. 3 Cir.1991). "The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record." Id. at 7.
Prior to this accident, Ms. Myers worked as a secretary for the Iberia Parish School Board in the Special Education Department. She last worked on August 2, 1995. Dr. Pettingill testified that Ms. Myers had a work-life expectancy of age sixty-two, and he based his future income loss calculations on the premise that she was totally disabled. He used an annual base income of $23,000.00 and estimated her future loss of earning capacity to be $567,142.00.
However, the jury was also presented with evidence that Ms. Myers was not qualified for the position paying $23,000.00 upon which the calculations were based because the position required a college degree. Although Ms. Myers led her potential employer to believe that she would receive a college degree the next semester, she actually had at *99 least another year of course work remaining. Additionally, she testified that she would have remained in her secretarial position because she enjoyed it. Thus, the jury was presented with evidence that she was not qualified for the job, and no other evidence was presented to the jury of her earning capacity other than her past earnings with the Iberia Parish School Board.
Additionally, no physician testified that Ms. Myers was permanently disabled such that she would never be able to work again. She had received some relief from the treatment that Dr. Reavill had performed, and she still had at least two more treatments remaining in Dr. Reavill's regimen. It is entirely possible that she would have been able to secure employment of some type in the future. We therefore find no reason to increase or decrease this award.
The defendants also assert as error the award of $29,376.10 for past medical expenses. They contend that this amount includes expenses which cannot be attributed to the August 9, 1991 accident and that the proper award should have been $19,222.46. Basically, the defendants dispute whether Ms. Myers actually had a separated shoulder, whether her low back problems were a result of this accident, and whether her stomach problems and collapsed lung were related to this accident. In order to recover past medical expenses, Ms. Myers must prove that it is more probable than not that the medical treatment was necessitated by the trauma suffered in the accident. Este' v. State Farm Ins. Cos., 96-99 (La.App. 3 Cir. 7/10/96); 676 So.2d 850.
There is conflicting evidence concerning Ms. Myers' shoulder injury. We note, however, that Dr. Elias' son was able to interpret what appeared to be a notation in his father's records that Ms. Myers had a separated shoulder, and the course of treatment reflects a belief by Dr. Elias that Ms. Myers suffered a shoulder injury, separated or not. Thus, although she may not have suffered a separated shoulder, a reasonable trier of fact could conclude that the charges for the shoulder injury were causally related to this accident.
As to the medical bills associated with Ms. Myers' low back problems, the defendants argue that she only initially complained of pain in her right shoulder and neck and that it was not until nearly five months after the accident that she first complained of low back problems. We note that Ms. Myers testified that Dr. Elias did initially treat her for "back pain." Dr. Hebert initially concluded that Ms. Myers' complaints were not valid and never wavered from that conclusion. Obviously, the jury rejected Dr. Hebert's opinion and relied instead on Dr. Phillips' opinion. Dr. Phillips testified that on Ms. Myers' first visit, his examination of her lumbar region revealed abnormal findings. Dr. Reavill also diagnosed lumbar difficulties on Ms. Myers' first visit. The jury was presented with an individual who led an intensely physically active life prior to the accident but suffered from a myriad of complaints thereafter. Defendants presented no explanation for the complaints other than the accident, and although it was presented with conflicting medical evidence, it was not error for the jury to conclude that the lumbar complaints and medical expenses associated therewith were causally related to the accident.
The defendants rely on Dr. Stokes' statement that he could only speculate as to the cause of Ms. Myers' stress which resulted in her collapsed lung and stomach problems to support their contention that the costs associated with these conditions were not recoverable. This narrow view of the evidence ignores other testimony by Dr. Stokes that indicated a probable causal connection. While the jury did hear testimony that Ms. Myers' job involved significant stress, that she had recently separated from her husband, and that she was trying to raise her two small daughters, we cannot say that it erred in concluding that her stress was causally connected to the accident.
The defendants also assign as error the jury's award of $100,000.00 for Ms. Myers' future medical treatment. Future medical expenses also must be established with some degree of certainty. Veazey, 587 So.2d 5. The plaintiff must show that it is more probable than not that these expenses *100 will be incurred. Id. Unless medical testimony is presented, setting out the probable cost of treatment and verifying that treatment is needed, an award of future medical expenses will not be made. Id. The jury cannot make this award based on mere speculation; much stronger proof, such as medical testimony, must be presented, setting forth the specific expenses to arise. Id.
Dr. Reavill testified that Ms. Myers' first epidural had been relatively successful and that she felt that Ms. Myers would benefit from having two more epidurals performed. Each of these procedures would cost $4,300.00 to $5,400.00, including hospital, physician, and medical costs. If these epidurals were not successful in relieving Ms. Myers' symptoms, then Dr. Reavill testified that Ms. Myers would be a good candidate for a spinal cord stimulator, whereby an electrode and battery pack is surgically implanted against the nerve roots causing the pain. Dr. Reavill testified that the electrode implantation would be a one-time event and that the cost of the electrode is approximately $15,000.00. However, according to Dr. Reavill, the battery pack itself, which costs $15,000.00 to $17,000.00, would have to be replaced every five to seven years. Accepting the testimony of Dr. Pettingill that Ms. Myers' life expectancy is 80.5 years, this future expense could run from $100,000.00 to $125,000.00.
Dr. Friedberg testified that Ms. Myers will need to see him one hour a week for one year at a total cost of $5,200.00. Dr. Phillips testified that Ms. Myers will probably need physical therapy in the future, and he estimated that she would need to attend therapy sessions three times a year for one month at a time. He also felt that she would need to see a doctor four times a year to refill her prescriptions. Dr. Pettingill estimated that her future prescriptions will cost $114,048.00 and her future physical therapy will cost $44,550.00. Dr. Pettingill assumed that she will need all of this treatment in the future and estimated that she would need approximately $381,150.00 to adequately compensate her for the medical expenses that she will incur in the future. Again, giving the appropriate deference to the fact finder's assessment, we find no error in this award. Therefore, the defendants' request for a decrease is denied.
Ms. Myers contends that the jury erred in failing to award her any sum for loss of household services. She testified that following the accident, she has paid $50.00 a week to have someone clean her house and $50.00 a week to have someone maintain her yard. Thus, she contends that she should have been awarded $100.00 a week for her loss of household services. Recovery for loss of household services is an item of special damages, thus requiring proof of an actual pecuniary loss. Andrus v. Board, 626 So.2d 1224 (La.App. 3 Cir.1993). Ms. Myers was not able to present any receipts or canceled checks showing that she had actually made any payments for housework or yardwork. Additionally, she testified that prior to the accident, she would only mow her yard once a month and her husband would mow the yard the other three times a month. We do not find that the jury erred in refusing to award Ms. Myers any sum for loss of household services when she failed to present any proof of such special damages. We find no merit to this assignment of error.
The final award at issue is that of loss of insurability for which the jury awarded $30,000.00. Both the defendants and Ms. Myers have requested review of this award. Fringe benefits are an item of damages recoverable as a matter of law. Averna v. Industrial Fabrication & Marine Serv., Inc., 562 So.2d 1157 (La.App. 4 Cir.1990).
Dr. Pettingill estimated that Ms. Myers' loss of insurability amounted to $160,269.00. He testified that she has two factors which will prevent her from being able to obtain health insurance: (1) she has been rated and (2) she is taking psychotropic medication. He calculated that she would pay $3,905.00 for Blue Cross/Blue Shield coverage. He simply took this amount and multiplied it by the number of years remaining on her life expectancy to arrive at a figure for her loss of insurability. On cross-examination, Dr. Pettingill admitted that his calculations were once again based on the assumption that she would never work again. He admitted that if *101 she could get a job in the future that provided its employees with insurance, then her loss of insurability would be zero.
The jury obviously concluded that Ms. Myers suffered some loss in this regard but was not satisfied that her loss was total. As we previously noted, even though awards for certain elements of damages may be inadequate or excessive, if the total sum awarded is neither inadequate nor excessive, then the award should not be disturbed on appeal. James, 94-162; 643 So.2d 424. We find no error in the jury's decision and decline to increase or decrease this award.

Costs
After trial, Ms. Myers filed a rule to show cause why certain expenses should not be taxed as costs and paid by the defendants. The expenses totaled $7,769.59, and the trial court entered judgment, recognizing the entire amount as costs and assessing them against the defendants. On appeal, the defendants contend that the court awarded excessive expert witness fees and travel expenses to Dr. Phillips and Dr. Pettingill.[7] Dr. Phillips flew by Air-Med helicopter from New Orleans to the trial in New Iberia, and Dr. Pettingill traveled from his home in Florida to testify.
The fixing of expert witness fees is within the discretion of the trial court and will not be disturbed in the absence of an abuse of discretion. Este', 96-99; 676 So.2d 850; La.R.S. 13:3666. The appropriate amount of expert witness fees will turn on the particular facts and circumstances of the case. Id. The trial judge is not required to set the fees at the amount charged by the expert. Boutte v. Nissan Motor Corp., 94-1470 (La.App. 3 Cir. 9/13/95); 663 So.2d 154. The trial court should consider the time spent testifying at trial; time spent preparing for trial; time spent away from regular duties while waiting to testify; the extent and nature of the work performed; and the knowledge, attainments, and skill of the expert. Reeves v. Thompson, 95-0321 (La.App. 4 Cir. 12/11/96); 685 So.2d 575. The court should also consider the helpfulness of the expert's testimony, the amount at issue, the complexity of the problem addressed by the expert, and the awards to experts in similar cases. Id. Additionally, although a litigant need not use a local expert, he is not entitled to an award of additional fees for an out-of-state expert if a local one is available. Welton v. Falcon, 341 So.2d 564 (La.App. 4 Cir.1976), writs denied, 342 So.2d 872, 1109 (La.1977).
Ms. Myers attached the doctors' invoices to the rule to fix costs, and the trial judge awarded the amount charged. There is no evidence concerning the lack of availability of a local expert economist who could have testified as to Ms. Myers' economic loss. However, as to Dr. Phillips' expert fee, the record does reveal that he was required to be away from his regular duties for a day; that his particular expertise and testimony were essential to Ms. Myer's recovery; and that the amount in controversy as well as the complexity of the medical testimony justify a $3,000.00 fee. Therefore, we find no error in the trial judge's award in this respect.
However, we do find Dr. Pettingill's award to be excessive given the close proximity of institutions of higher learning and thus, the availability of local expert economic testimony. Since we have no evidence as to the amounts awarded as expert witness fees to local economic experts, we remand to the trial court for a determination of the proper amount to be awarded Dr. Pettingill.
Additionally, we do not find that the travel expense awards were proper. La.R.S. 13:4533 provides:
The costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.
(Emphasis added).
The authority for allowing an expert witness additional compensation in excess of that allowed *102 for a lay witness is La.R.S. 13:3666 which reads in pertinent part as follows:
A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.
The statute does not provide for the recovery of travel expenses. Travel expenses for in-state witnesses are addressed in La.R.S. 13:3661, which provides that a litigant requesting a subpoena for an in-state witness residing at a distance greater than twentyfive miles from the trial location must deposit adequate funds with the clerk of court to cover the witness' travel expenses at the rate of twenty cents a mile. Therefore, the rendition of a judgment for travel expenses in excess of this amount is not authorized by statute and must be set aside. While we recognize that the amount authorized is woefully inadequate for travel expenses, it is the only statutory authority for such an award. A round trip from New Orleans to New Iberia is 276 miles.[8] Thus, based on a rate of twenty cents a mile, we award $55.20 for Dr. Phillips' travel expenses.
As to Dr. Pettingill, there is no statutory authority for the award of travel expenses, and therefore, that award shall be set aside. See Rebowe v. Hines, 343 So.2d 351 (La.App. 4 Cir.1977).

Statutory Penalties and Attorney Fees
The two penalty statutes at issue in this litigation both require a finding that the insurer was arbitrary and capricious before penalties and attorney fees can be imposed. The trial judge found that State Farm breached its obligations under both but declined to impose the more stringent penalties of La.R.S. 22:1220.
La.R.S. 22:658(A)(1) requires that an insurer issuing any policy other than one for life or health and accident coverage "pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured." The time delay for payment, after receiving proof of loss, under La.R.S. 22:1220(B) is sixty days. Where, as in this case, a partial payment has been made, La.R.S. 22:658(B)(1) provides for a penalty equal to "ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees" where an insurer is found to be "arbitrary, capricious, or without probable cause" in failing to make a timely tender or payment. The penalty imposed under La.R.S. 22:1220(C) for breach of a duty under that statute can be as high as "two times the damages sustained or five thousand dollars, whichever is greater."
La.R.S. 22:1220 places "a duty of good faith and fair dealing" on the insurer in negotiating claims and provides that "[t]he insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both." La.R.S. 22:1220(A). If the failure to pay the claim within sixty days after receiving a satisfactory proof of loss is found by the trial court to be arbitrary, capricious, or without probable *103 cause, then this finding constitutes a breach of the duties imposed under La.R.S. 22:1220(A). La.R.S. 22:1220(B).
In contrast to La.R.S. 22:658, for an insurer to be liable for damages under La.R.S. 22:1220, the insured must prove that he sustained actual damages due to the insurer's breach. Khaled v. Windham, 94-2171 (La. App. 1 Cir. 6/23/95); 657 So.2d 672. As the trial judge found that State Farm breached its duties to Ms. Myers imposed under La. R.S. 22:1220 but imposed no penalty for the breach, we must conclude that the trial judge also found that Ms. Myers sustained no actual damages as a result of the breach. For the reasons that follow, we also conclude that Ms. Myers is not entitled to relief under La.R.S. 22:1220.
To be successful under La.R.S. 22:658, a plaintiff must prove that the insurer received satisfactory proof of loss, failed to pay the claim within thirty days after receiving sufficient proof of loss, and such failure to timely tender a reasonable amount was arbitrary and capricious. Khaled, 94-2171; 657 So.2d 672. The supreme court has defined "sufficient proof of loss" as follows:
that which is sufficient to fully apprise the insurer of the insured's claim. To establish a "satisfactory proof of loss" of an uninsured/underinsured motorist's claim, the insured must establish that the insurer received sufficient facts which fully apprise the insurer that (1) the owner or operator of the other vehicle involved in the accident was uninsured or underinsured; (2) that he was at fault; (3) that such fault gave rise to damages; and (4) establish the extent of those damages.
McDill v. Utica Mut. Ins. Co., 475 So.2d 1085, 1089 (La.1985) (citation omitted).
Whether a refusal to pay a claim is arbitrary, capricious, or without probable cause hinges on the facts known to the insurer at the time of its refusal to pay the claim. Wells v. Houston, 95-202 (La.App. 3 Cir. 6/7/95); 657 So.2d 474, writ denied, 95-1733 (La.10/13/95); 661 So.2d 500. The determination of whether an insurer's handling of a claim is arbitrary or capricious is one of fact, which should not be disturbed on appeal unless it is manifestly erroneous. Khaled, 94-2171; 657 So.2d 672. However, the provisions of La.R.S. 22:658 are penal in nature and should be strictly construed. Perkins v. Guaranty Nat'l Ins. Co., 95-229 (La.App. 3 Cir. 11/2/95); 667 So.2d 559, writ denied, 96-0759 (La.5/31/96); 673 So.2d 1033. If an insurer, in good faith, has presented a reasonable defense for its failure to timely tender payment, then these penalty provisions should not apply. Id.
As to the four elements required for a sufficient proof of loss as identified by the supreme court decision in McDill, the second and third are not in dispute. The question to be addressed is whether Ms. Myers established that Mr. Broussard was underinsured to the extent that her damages exceeded his coverage as well as her UM coverage.
Between September 12, 1991, and May 7, 1993, State Farm paid a total of $8,506.08 to various payees. The first payment by State Farm was made directly to Ms. Myers on September 12, 1991, and was tendered to reimburse her for lost wages since the accident. According to the State Farm payment record, twenty-one additional disbursements were made through May 7, 1993. The majority of these payments, both in amount and frequency, were disbursed to pay for physical therapy expenses. Others included payments to Iberia General, Dr. Elias, Dr. Hebert, Thrifty Way Pharmacy, and New Orleans Orthopedic Clinic.
Shortly after the accident, State Farm began corresponding with Ms. Myers' original attorney concerning outstanding medical expenses and lost wages. By correspondence dated February 19, 1993, Ms. Myers' attorney acknowledged receipt of $6,132.00 for medical specials, leaving only $798.00 outstanding. Additionally, he claimed that despite the $1,000.00 payment, there remained a balance due in lost wages of $3,132.53. Concerning settlement, the attorney stated in the letter that "in light of the duration of treatment and the amount of specials that remain, I feel that the absolute bottom line would be $15,000.00 inclusive of specials" to settle the litigation. (Emphasis added). While the settlement statement was not made in the form of an offer, Ms. Myers' *104 attorney suggested that if State Farm were to make such an offer, he "could very likely convince her to accept it." State Farm responded by offering to settle the claim for $15,000.00, but Ms. Myers rejected that offer.
Ms. Myers then changed attorneys, and her current attorney first wrote State Farm on March 25, 1993. In that correspondence, he requested payment of medical expenses totaling $6,820.14, all of which had already been paid, except a $200.25 statement from Iberia General. Upon receipt of the letter, State Farm immediately issued a check for that obligation.
The first medical expenses refused by State Farm were forwarded to it by Ms. Myers' attorney by correspondence dated May 6, 1993, and related to Dr. Phillips' evaluation and treatment. The total reimbursement request in that correspondence was $3,886.00. An additional request for $3,165.00 in medical expenses was forwarded by correspondence dated June 10, 1993, and was also rejected. The handwritten response from State Farm stated that its records reflected payment of $7,506.08 in medical expenses and $1,000.00 in lost wages, that this exceeded the medical payment coverage of the policy, and that it was not willing to make any further advances under its liability coverage.
Ms. Myers' attorney then forwarded copies of Dr. Phillips' medical records to State Farm and renewed his request for medical expenses. In that correspondence dated August 31, 1993, Ms. Myers' attorney offered to release Mr. Broussard personally for any excess judgment in exchange for the payment to Ms. Myers of Mr. Broussard's policy limits. This offer was not accepted by State Farm. Over the next months, Ms. Myers' attorney forwarded various medical records and bills associated with Dr. Phillips' treatment to State Farm. No new payments were tendered by State Farm, and by correspondence dated September 6, 1995, State Farm offered $20,000.00 in addition to that already paid to settle the claim. This offer was not accepted.
This litigation is further complicated by the fact that State Farm maintained both the liability and UM coverages and that in each capacity, it was represented by the same attorney. The trial judge's reasons for judgment suggest that this overlapping coverage played a significant factor in his award. However, that possible conflict is not, by itself, an adequate basis to award penalties. Studies have suggested that:
The most common basis for denial [of penalties and attorney fees] is a finding that the insurer had legitimate medical reasons for the denial, especially on the complex question of the existence of disability.
15 WILLIAM SHELBY MCKENZIE & H. ALSTON JOHNSON, III, LOUISIANA CIVIL LAW TREATISE, INSURANCE LAW AND PRACTICE § 293, at 573 (1986) (footnote omitted).
We find that the trial court erred in awarding statutory penalties in this case. The medical evidence is extremely conflicting as to the causation and duration of Ms. Myers' injuries and has been for the entirety of this litigation. Even the jury's award indicates that it might have questioned whether all of Ms. Myers' stress-related conditions were causally connected to this accident. State Farm was presented with Dr. Hebert's opinion that Ms. Myers had minimal injuries which would resolve themselves without difficulty and the opinions of Dr. Phillips and Dr. Reavill who were of the opinion that her medical problems were substantial. However, neither Dr. Phillips nor Dr. Reavill testified that Ms. Myers was permanently disabled and much of their testimony concerning origin of the complaints could be construed differently by different triers of fact. Additionally, Dr. Friedberg testified that Ms. Myers did not follow his advice concerning counseling and relaxation training, and the inconsistencies in Ms. Myers' testimony concerning her weight loss, travel ability, and medical treatment only added to the conflict. While the jury verdict would suggest that State Farm erroneously evaluated the claim, that erroneous evaluation does not equate to State Farm being arbitrary and capricious. Had the jury returned a verdict within Mr. Broussard's policy limits, an appellate court review, pursuant to the manifest error standard, might well have sustained such a verdict.
*105 Therefore, we find that Ms. Myers did not present sufficient evidence to sustain her burden of proof as required by the supreme court holding in McDill, 475 So.2d 1085, and that portion of the judgment awarding penalties and attorney fees is set aside. For this reason, we need not address the question of whether an attorney fee, equaling one-third of the jury award, is excessive.

CONCLUSION
For the above reasons, the judgment of the trial court is amended to reduce the award for Dr. Phillips' travel expenses to $55.20. The trial court judgment is reversed insofar as it awards travel expenses to Dr. Pettingill. Additionally, that portion of the trial court judgment awarding Ms. Myers penalties and attorney fees pursuant to La. R.S. 22:658 is reversed in full, and that claim is rejected. We remand to the trial court for a hearing to determine the proper amount to be awarded for Dr. Pettingill's expert testimony. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed one-half to Ms. Myers and one-half to Mr. Broussard and State Farm.
REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART AND RENDERED; AND REMANDED.
NOTES
[1] Dr. Elias saw Ms. Myers five times in August 1991; three times in September 1991 and March 1992; two times in October, November, and December 1991, and January, February, October, November, and December 1992; one time in May and September 1992; and four times in January 1993.
[2] Dr. Hebert even disagreed with the radiologist's conclusion that a space defect existed in Ms. Myers' acromioclavicular joint.
[3] Based on a daily wage rate of $45.00 in 1991, $54.00 in 1992, $56.48 in 1993 and 1994, and $58.00 in 1995 as testified to by Ms. Myers.
[4] For example, Ms. Myers is shown as having missed thirty-one days of compensable work in October 1991. A number of other months have similar totals.
[5] Based on a taxable income of $10,800.00 in 1991 (240 days at $45.00 per day); $12,964.80 in 1992 (240 days at $54.02 per day); and $13,555.20 in 1993 and 1994 (240 days at $56.48 per day).
[6] Based on a taxable income of $13,920.00 (240 days at $58.00 per day) and a total number of days missed of 212.
[7] The trial court awarded $3,000.00 to Dr. Phillips and $2,000.00 to Dr. Pettingill. It awarded $926.50 for the cost of the Air-Med helicopter flight in conjunction with Dr. Phillips' testimony and awarded $779.00 for the cost of a commercial airline ticket and $318.09 for the cost of a rental car in conjunction with Dr. Pettingill's testimony.
[8] Since the record contains no evidence of the mileage between New Orleans and New Iberia, we have taken judicial notice of a map of the State of Louisiana to calculate this mileage figure.